Dora A. GRAHAM, Appellee,

v.

Scott E. GRAHAM, Appellant.

Superior Court of Pennsylvania.

Submitted Jan. 16, 2002.

Filed March 13, 2002.

Wayne H. Hundertmark, Franklin, for appellant.

Bruce T. Rosen, Oil City, for appellee.

BEFORE: DEL SOLE, P.J., BOWES and KELLY, JJ.

BOWES, J.:

¶ 1 Scott Graham ("Father") appeals from the August 24, 2000 order of the Venango County Court of Common Pleas awarding primary physical custody of the parties' daughter, Alisha, to Dora Graham ("Mother") and allowing her to relocate to Florida with Alisha. We are constrained to reverse.

¶ 2 The parties married in 1990, and Alisha was born on June 14, 1993. She was six years old at the time the parties separated in 1999; she presently is eight years old. Mother filed a complaint for divorce with a custody count on July 13, 1999, wherein she sought primary legal and physical custody. Following a conciliation and by agreement of the parties, the Common Pleas Court entered an Order on November 4, 1999, directing the parties to share legal and physical custody as follows: Father had physical custody on his days off work, as well as Tuesdays after school until Thursday morning, and one or two weekends per month. Mother had custody at all other times. Father managed a mall cinema; Mother had an in-home daycare center. Both parties had homes that accommodated Alisha's needs.

¶ 3 Father filed a petition to modify custody on April 18, 2000, in which he sought primary physical custody. The following day Mother filed a petition to modify, which sought primary physical custody and permission to relocate to Florida with Alisha. Following two unproductive conciliations, a custody hearing was held on August 22–24, 2000. Father presented nine witnesses; Mother presented five. Additionally, the court interviewed Alisha in chambers and Mother's boyfriend by telephone.

¶ 4 The trial court granted Mother's petition to modify, allowed her to relocate to Florida, and granted Father partial custody for two continuous months during the summer, two-thirds of Christmas vacation, during any spring break that is at least five days in duration, during any period he visits in Florida, and one-half the time whenever Mother visits their home area in Pennsylvania.

¶ 5 In concluding that Mother could relocate to Florida with Alisha, the trial court applied the factors contained in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434 (1990), which can be summarized as follows:

When either parent files a petition which raises the issue of whether it is in the best interest of a child to move outside of the jurisdiction, "a hearing must be held either before the move, or under exigent circumstances, within a reasonable time thereafter." *Plowman v. Plowman*, 409 Pa.Super. 143, 153 597 A.2d 701, 706 (1991). If the parents are able to arrive at a mutual decision regarding a minor child's move from the jurisdiction, a hearing is not required. *Id....*

In every relocation dispute, the court must consider the following interests. [T]he custodial parent's desire to exercise autonomy over the basic deci-

sions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children.

*White v. White,* 437 Pa.Super. 446, 450, 650 A.2d 110, 113 (1994), quoting *Gruber v. Gruber,* 400 Pa.Super. 174, 184, 583 A.2d 434, 438–39 (1990). When faced with the decision whether to permit a custodial parent to relocate at a geographical distance from the non-custodial parent, a trial court must consider these factors:

1. The potential advantages of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent;

2. The integrity of the motives of both the custodial and noncustodial parent in either seeking the move or seeking to prevent it; and

3. The availability of realistic, substitute visitation arrangements which will foster adequately an ongoing relationship between the child and the noncustodial parent.

*White v. White, supra,* 437 Pa.Super. at 451, 650 A.2d at 113, quoting *Gruber v. Gruber, supra,* 400 Pa.Super. at 184–85, 583 A.2d at 439. The factors to be considered are refinements of the basic standard which remains the best interest of the child. *Lee v. Fontine,* 406 Pa.Super. 487, 594 A.2d 724 (1991); *see*

*also* Pa. Family Law Prac. And Proc., *supra.* Moreover, the fact that considerable distance will increase the cost and logistical problems of maintaining contact between the child and the noncustodial parent does not necessarily preclude relocation when other factors militate in favor of it. *Id.*

*Perrott v. Perrott,* 713 A.2d 666, 668–69 (Pa.Super.1998) (quoting *Gancas v. Schultz,* 453 Pa.Super. 324, 683 A.2d 1207, 1209–10 (1996)). The *Gruber* factors apply with equal force to relocation cases where the parties share physical custody. *Thomas v. Thomas,* 739 A.2d 206 (Pa.Super.1999). These factors must be applied "with the backdrop of the ... objective of determining the best interests of the child." *Burkholder v. Burkholder,* 2002 PA Super 6, ¶ 14, 790 A.2d 1053 (*citing Anderson v. McVay,* 743 A.2d 472, 474 (Pa.Super.1999)).

¶ 6 Father raises two intertwined issues for our review. He contends the trial court erred in determining that Mother met the standards enunciated in *Gruber* and in concluding that Alisha's best interests required that Mother assume primary physical custody. We will address these issues together.

■ ¶ 7 It is clear in reviewing a child custody order,

Our scope of review ... is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it ... However, the broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination ... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but

it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and, thus, represent a gross abuse of discretion.

*Vineski v. Vineski,* 450 Pa.Super. 183, 186, 675 A.2d 722, 723 (1996). Our Supreme Court noted the following regarding our scope of review:

> In reviewing custody matters, this court has stated that our scope of review "is very broad. Nonetheless, a broad scope of review should not be construed as providing the reviewing tribunal with a license to nullify the factfinding functions of the court of the first instance." *Albright v. Commonwealth, ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157, 158–59 (1980) (citations omitted). We have stated that an appellate court may not reverse a trial court's custody order absent a showing that the trial court abused its discretion. *See Robinson v. Robinson,* 538 Pa. 52, 645 A.2d 836 (1994).

> It is axiomatic that in custody disputes, "the fundamental issue is the best interest of the child." *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512, 513 (1980).

*Charles v. Stehlik,* 560 Pa. 334, 339–40, 744 A.2d 1255, 1257–58 (1999).

¶ 8 Father contends the trial court "erred in its application of the *Gruber* standards," Appellant's brief at 12, focusing primarily on the first factor, that the potential advantages of the proposed move would substantially improve the quality of life of Mother and Alisha and that the move was not the result of a momentary whim on Mother's part. In making his argument, Father underscores Mother's relationship with her boyfriend, Roger Wile, who lives in Florida. Mother dated Mr. Wile in high school and resumed a relationship with him through the Internet before she and Father separated. After they reconnected, Mother and Mr. Wile corresponded and visited each other three or four times. We agree with Father and address this argument at length *infra.* Initially, however, we examine the court's assessment of the second and third factors in light of Father's arguments.

■ ¶ 9 The second factor is the integrity of the parties' motives in either seeking to move or seeking to prevent it. The trial court determined that Mother did not seek to move to Florida in order to thwart Father's relationship with Alisha. Similarly, it concluded that Father did not seek to prevent the move solely to interfere with Mother's custody. We agree with the trial court's conclusion in this regard; there is nothing in the record to suggest otherwise.

■ ¶ 10 As to the third *Gruber* factor, which is the availability of realistic, substitute visitation arrangements, the trial court concluded that Mother suggested "vehicles to assure Alisha stays bonded to her father," Findings of Fact, 9/13/00, N.T., 8/24/00, at 17, and the court would assure that Alisha spends the bulk of her vacations with Father. While we disagree with the court's inference that staying connected via the Internet could ever be a substitute for face-to-face contact, *see* N.T., 8/24/00, at 17, particularly in a young child, the court fashioned an award that gives Father sixty consecutive days in the summer plus Christmas and spring vacations. Based on the record, then, we would not necessarily find that the trial court's resolution of this factor indicates an abuse of discretion.

■ ¶ 11 However, our review of the record compels our conclusion that the trial court did abuse its discretion, and the evidence does not support, the court's determination that the potential advantages of the move substantially will improve Mother's and Alisha's quality of life and

that the move is not the result of a momentary whim on Mother's part.

¶ 12 Mother testified that the only reason she wanted to move to Florida was "to be with Roger." N.T., 8/23/00, at 73. She testified that she and Mr. Wile had no plans to marry. *Id.* at 78–79. Since she was not planning to work in Florida, she would be financially dependent upon Mr. Wile. Moreover, Mother's and Father's relatives live in Pennsylvania. Mother has no close friends in Florida. *Id.* at 78. At the time of the hearing, Mother spent only three or four weeks actually in Mr. Wile's physical company. *Id.* at 92–98. Mr. Wile refused to attend the custody hearing, maintaining that he was not involved in the matter and saw no need to attend it. *Id.* at 99. Regarding his relationship with Mother, Mr. Wile testified via telephone as follows:

Q. You indicated that marriage is not in the future right now?

A. I didn't say that, I wasn't real sure.

Q. Why aren't you sure?

A. I'm just not sure.

Q. So you think—

A. It's a big step.

Q. Making a big commitment, isn't it?

A. Yes, it is.

Q. You're not sure you want to make that commitment, is that right?

A. I didn't say that.

Q. Well, at least you're hesitating to make the commitment, right?

A. Excuse me.

Q. You're hesitating?

A. It's kind of hard 1200 miles away to make any kind of commitment.

Q. How do you feel about Dora?

A. How do I feel about Dora, I have known her since high school.

Q. How do you feel about her?

A. I feel fine about her; she's a good woman.

Q. Good deal. Do you feel anything else about her?

A. Do I, no.

Q. Do you feel any other feelings about her, do you have any other feelings besides feeling fine?

A. Well, it's not like we spent a whole lot of time together over the last year, so . . .

*Id.* at 213–14.

¶ 13 In addressing the potential advantages of the move, the trial court referred to the tenuous relationship between Mother and Mr. Wile, noting that it was "at best, really up in the air and that does present some problems in terms of assessing the move." Findings of Fact, N.T., 8/24/00, at 15. However, the court ignored this factual finding and stated:

We conclude that there are potential advantages to the move in that it would allow the mother to establish a relationship with someone she wants to be with. We find that the move by the mother is not a function of whim to the extent that she hopes to find a solid and loving relationship that both she and Alisha will benefit from.

The drawback of the move is the uncertainty of that relationship if a mistake is made; however, if a mistake is made, we find it can easily be undone by the mother either by returning here where she has a very strong support structure . . .

Findings of Fact, 9/13/00, N.T., 8/24/00, at 15–16.

¶ 14 We are guided herein by our decision in *Meyer–Liedtke v. Liedtke,* 762 A.2d 1111 (Pa.Super.2000). In that case, the mother, who had primary physical custody of the parties' two daughters, desired to move with her new husband from Pennsyl-

vania to California. The trial court refused the mother's request to relocate, and we affirmed. This Court's reiteration of the trial court's determination therein is particularly apt:

> [T]he court also properly recognized that the personal happiness of the relocating parent cannot be the only or the predominant factor. The court wisely stated:
>
>> It is beyond the belief of this court that any parent would petition to relocate their children if said relocation would not contribute to the personal happiness and emotional well-being of the petitioning parent. If these particular benefits to the relocating parent were to carry such weight alone, few relocations petitions would demand much attention and time by the court, few would be denied, and the best interest of the children would take a back seat to the best interests of the relocating parent in virtually every case. Instead, this court is of the opinion that these factors are just some of the many that must be weighed by the court on the scales of the best interests of the children.

*Id.* at 1114.

¶ 15 It is clear that in the instant case, contrary to the dictates of *Meyer–Liedtke,* the trial court focused on Mother's personal happiness to the exclusion of the other relevant facts. Moreover, the record simply does *not* support the trial court's conclusions that the move substantially would improve Mother's and Alisha's quality of life and was not the result of Mother's momentary whim. Mother was not moving to join a man she was marrying, she was moving in with a man who admitted he was uncertain whether marriage was in their future and who described his feelings for her as "fine." N.T., 8/23/00, at 214. Mother would have no source of income and no support of family or friends in the area. Most significantly, Mother admitted that the only reason for the move was that she wanted "to be with Roger." *Id.* at 73.

¶ 16 Moreover, the trial court referred to Mother's testimony that she would not be working [1] when she moved and intended "to be a full-time parent." Findings of Fact, 9/13/00, N.T., 8/24/00, at 12. However, Alisha is in school all day, and Mother's employment in Pennsylvania was an in-home daycare that allowed Mother to be available to Alisha at all times. Thus, we can see no significant *added* benefit to Mother not working in Florida in light of the significant *detriments* that the move entails.

¶ 17 We note that Mother's reliance on *Mealy v. Arnold,* 733 A.2d 652 (Pa.Super.1999), is misplaced. While the instant case is similar to *Mealy,* there are significant differences. The mother in *Mealy* was engaged to be married, and her new husband, a physician and captain in the United States Army, was assigned to Fort Bragg, North Carolina, to complete his residency. Mother was going to enroll in college to complete a degree in psychology once her daughter acclimated to the North Carolina area. The record in *Mealy* clearly supported the conclusion that the relocation was *not* a momentary whim, and there were a multitude of factors that

---

1. The trial court, in the course of its analysis, questioned whether Mother would prove to be a good role model for her daughter if she were a stay-at-home mother and not working. Such an observation implies that being a full-time mother is less valuable than being a career woman. Surely, our society has advanced beyond such facile categorizations of the worth or dignity of individuals based upon career choices. Moreover, a parent's decision to devote time and attention to the rearing of a well-adjusted and happy child such as Alisha should never be discounted.

would improve the mother's quality of life. We determine *Mealy* is distinguishable from the present case.

¶ 18 We conclude that the trial court did not apply *Gruber* and its underlying principles "while recognizing that it is the best interest of the children which is the ultimate guidepost for its decision." *Meyer–Liedtke v. Liedtke, supra,* at 1114. The trial court concluded herein that Alisha's best interest "is being with her mom," N.T., 8/24/00, at 18. Once the trial court considers the *Gruber* factors, these considerations must then be factored into the ultimate consideration of the court: a determination of the child's best interest. *Gancas v. Schultz,* 453 Pa.Super. 324, 683 A.2d 1207 (1996). Even after observing that both parties are "excellent parents," Findings of Fact, N.T., 8/24/00, at 11, the trial court failed to analyze whether the relocation was in Alisha's best interest. The court merely concluded that the child should "primarily stay with her mother. . . Even though she prefers to stay with her extended family and friends at this location, I find that wrenching her away from a person whom she is closest and most bonded with would be very painful. . . ." *Id.* at 17–18. However, this conclusion by the trial court ignores Mother's testimony that she would not move to Florida without Alisha and instead, would put her "life on hold for her." N.T., 8/23/00, 75. Thus, "wrenching her away" from Mother never was a reality.

¶ 19 Moreover, the court *acknowledged* that Alisha stated, given a choice, she would rather remain in Pennsylvania with Father. Nevertheless, the court concluded that Alisha "qualified that by saying she would want it to go on as it is with her being principally with her mother." *Id.* at 15. However, the qualification to which the court refers was an attempt by Mother's counsel to rehabilitate the child's testi-

mony. After stating that she preferred to remain in Pennsylvania with Father, Alisha merely offered an affirmative response to counsel's question, "So you would like to keep it the way it is, is that what you are saying; live part of the time here, part of the time there?" *Id.* at 254–55.

■ ¶ 20 Alisha's preference is supported by the testimony of Dr. Audean Duespohl, the psychologist who counseled Alisha during the fall of 1999. Dr. Duespohl testified that Alisha preferred to live with Father. N.T., 8/22/00, at 20. While the express wishes of a child in a custody action are not controlling, they constitute an important factor that must be considered carefully by the trial court when determining the child's best interest. *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992).

¶ 21 It is beyond belief that a parent's desire to test a relationship, which is lacking in *any* commitment and is offered as the *sole* basis for relocation 1200 miles away, was permitted to uproot a child from all of her supports, most notably her relationship with her other parent with whom she spends a considerable part of each week. This record identifies *no* concrete advantages of the move and instead, highlights a number of detriments.

¶ 22 We determine that the trial court's conclusions are unreasonable in light of its factual findings. The record does not support the trial court's determination that the advantages of the move would substantially improve Alisha's quality of life, nor does it support the conclusion that Mother's decision was not the result of a momentary whim. Thus, we are constrained to reverse the order that granted Mother's request to relocate. Since the grant of primary physical custody to Mother was based on her relocation, that grant also is reversed.

¶ 23 Order reversed; case remanded for entry of an order consistent with our determination. Jurisdiction relinquished.