John F. MARSHALL, Appellant,

v.

Dianne MARSHALL, Appellee.

Superior Court of Pennsylvania.

Argued Aug. 22, 2002.

Filed Dec. 30, 2002.

H. John Drayer, Clarion, for appellant.

Bruce T. Rosen, Oil City, for appellee.

Before: JOHNSON, MUSMANNO and BOWES, JJ.

BOWES, J.

¶ 1 John F. Marshall ("Father") appeals from the February 28, 2002 order of the Court of Common Pleas of Clarion County allowing Dianne Marshall ("Mother") to

relocate to Hilton Head, South Carolina, with the parties' two children. For the following reasons, we are constrained to reverse and remand.

¶ 2 The parties married in Clarion County on February 25, 1995, and separated on August 8, 2001. N.T., 1/10/02. Two boys were born of the marriage: John, presently age six, was born February 10, 1996, and James, known as William, presently age five, was born on September 9, 1997. At the time of the custody hearing, Mother and the boys lived in the marital residence on an eighty-one acre farm outside of Knox, Pennsylvania, about seventeen miles from Clarion. *Id.* at 13. Father temporarily resided in a make-shift apartment in the building that houses his law office, but he planned to move after the equitable distribution in the divorce settlement. N.T., 1/11/02, at 163–64, 166. Father had custody of the boys every Wednesday and every other weekend from Friday to Sunday pursuant to an interim order.

¶ 3 Father left the marital residence at Mother's request on August 8, 2001. *Id.* at 168. Two weeks later, Father filed a complaint for custody in which he sought shared legal and physical custody. Mother filed an answer on September 25, 2001, in which she requested primary physical custody and asserted her intention to move to Hilton Head, South Carolina, in order "to live in closer proximity to her family and the support they offer her." Answer, 9/25/01, at 3. That same day, Father filed an emergency petition for special relief asking the court to order Mother to remain in Clarion County, Pennsylvania, pending a hearing. The trial court granted the petition.

¶ 4 On October 4, 2001, following a conference, the trial court entered an interim consent order granting the parties shared legal custody, with primary physical custody in Mother. The court awarded Father partial physical custody alternating weekends from approximately 11:00 a.m. on Friday until 5:00 p.m. on Sunday and every Wednesday from 7:00 a.m. until 7:00 p.m. pending a full hearing; additionally, the court ordered psychological evaluations of the parties and children.

¶ 5 The trial court held a hearing on January 10 and 11, 2002, at which the parties stipulated to "treating the entire proceeding as a relocation case in which [Mother] will have the burden of proof...." N.T., 1/10/02, at 4. Following the hearing, at which the parties, their parents, and various other witnesses testified, and after admission of the expert report, the hearing court entered an order on February 28, 2002, allowing Mother to relocate to Hilton Head with the children as of June 2002. This appeal by Father followed.

¶ 6 Father raises the following issues for our review:

1. Whether the trial court abused its discretion/committed an error of law by not insuring that a full and complete record was made where an experts' report was admitted into evidence by stipulation of the parties and the Court felt there was an ambiguity or question involving the experts' report, and the Court failed to call the experts to testify.

2. Whether the Court abused its discretion/committed an error of law in failing to consider both family units where no prior custody order awarding primary custody was in place.

3. Whether the Court abused its discretion/committed an error of law in finding there would be a substantial improvement to Mother's life by allowing a move to South Carolina.

4. Whether the Court abused its discretion/committed an error of law in

finding that there would be a substantial improvement to the quality of life of the children by the proposed move to South Carolina.

5. Whether the Court abused its discretion/committed an error of law in finding Mother's motives for the move pure.

6. Whether the Court abused its discretion/committed an error of law in finding that realistic substitute partial custody was available.

7. Whether the Court abused its discretion/committed an error of law and disregarded recommendations contained in an expert's psychological report jointly stipulated to be admitted into evidence by the parties.

8. Whether the Court abused its discretion/committed an error of law in concluding the best interests of the children would be served by moving with their Mother to South Carolina.

Father's brief at 4. We find merit in issues two, four, six, and eight, and are compelled to reverse.

■■■ ¶7 Our scope and standard of review is settled:

As with all custody cases, our scope of review is plenary. *See Maurer v. Maurer*, 758 A.2d 711, 713 (Pa.Super.2000). Our standard of review in custody matters is well-settled. We are "not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record." *Id.* (citation omitted). We are not authorized to "nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court." *Id.* "Rather, we are bound by findings supported by the record, and may reject conclusions drawn by the trial court only

if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court."

*Boyer v. Schake*, 799 A.2d 124, 126 (Pa.Super.2002). Moreover, since this is a case involving the desired relocation of one of the parents against the wishes of the other parent, the trial court was obliged to analyze it, against the backdrop of the children's best interests, pursuant to the factors contained in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434 (1990), which can be summarized as follows:

When either parent files a petition which raises the issue of whether it is in the best interest of a child to move outside of the jurisdiction, "a hearing must be held either before the move, or under exigent circumstances, within a reasonable time thereafter." *Plowman v. Plowman*, 409 Pa.Super. 143, 153, 597 A.2d 701, 706 (1991). If the parents are able to arrive at a mutual decision regarding a minor child's move from the jurisdiction, a hearing is not required. *Id.* . . .

In every relocation dispute, the court must consider the following interests.

[T]he custodial parent's desire to exercise autonomy over the basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children.

*White v. White*, 437 Pa.Super. 446, 450, 650 A.2d 110, 113 (1994), quoting *Gruber v. Gruber*, 400 Pa.Super. 174, 184, 583 A.2d 434, 438–39 (1990). When faced with the decision whether to permit a

custodial parent to relocate at a geographical distance from the non-custodial parent, a trial court must consider these factors:

1. The potential advantages of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent;

2. The integrity of the motives of both the custodial and noncustodial parent in either seeking the move or seeking to prevent it; and

3. The availability of realistic, substitute visitation arrangements which will foster adequately an ongoing relationship between the child and the noncustodial parent.

*White v. White, supra,* 437 Pa.Super. at 451, 650 A.2d at 113, quoting *Gruber v. Gruber, supra,* 400 Pa.Super. at 184–85, 583 A.2d at 439. The factors to be considered are refinements of the basic standard which remains the best interest of the child. *Lee v. Fontine,* 406 Pa.Super. 487, 594 A.2d 724 (1991); *see also* Pa. Family Law Prac. And Proc., *supra.* Moreover, the fact that considerable distance will increase the cost and logistical problems of maintaining contact between the child and the noncustodial parent does not necessarily preclude relocation when other factors militate in favor of it. *Id.*

*Perrott v. Perrott,* 713 A.2d 666, 668–69 (Pa.Super.1998) (quoting *Gancas v. Schultz,* [453 Pa.Super. 324,] 683 A.2d 1207, 1209–10 (1996)). The *Gruber* factors apply with equal force to relocation cases where the parties share physical custody. *Thomas v. Thomas,* 739 A.2d 206 (Pa.Super.1999). These factors must be applied "with the backdrop of the . . . objective of determining the best interests of the child." *Burkholder v. Burkholder,* [790 A.2d 1053, 1058 (Pa.Super.2002)] (*citing Anderson v. McVay,* 743 A.2d 472, 474 (Pa.Super.1999)).

*Graham v. Graham,* 794 A.2d 912, 913–14 (Pa.Super.2002).

■ ¶ 8 It is clear in this case that the trial court erred in focusing on Mother as the primary custodial family unit. Father filed his complaint for custody on August 24, 2001. Mother's request to relocate was contained in her answer[1] to the complaint, which she filed on September 25, 2001. The court then entered the interim consent order on October 4, 2001, pursuant to the agreement of the parties. Clearly, the interim order was entered after Mother's request to relocate. Where, as here, there was no order awarding primary custody to either parent in place **prior to Mother's request to relocate,** the trial court was compelled to scrutinize both custodial environments without favoring one over the other. *Beers v. Beers,* 710 A.2d 1206, 1209 (Pa.Super.1998) (plurality); *cf. Thomas v. Thomas,* 739 A.2d 206 (Pa.Super.1999) (*en banc*) (where there are two primary family units, both must be evaluated similarly); *McAlister v. McAlister,* 747 A.2d 390, 392 (Pa.Super.2000) (where custody agreement in place and parent seeks to relocate, trial court required to analyze factors in context of two competing custodial environments); *see also Burkholder v. Burkholder, supra* (where no prior custody order exists, relo-

---

**1.** Although there was no separate petition requesting relocation, the parties stipulated that the focus of the proceedings centered on relocation. N.T., 1/11/02, at 154.

cation factors are analyzed in context of two competing custodial environments); *Hurley v. Hurley*, 754 A.2d 1283 (Pa.Super.2000) (absent a pre-existing custodial order, both parents initially stand on equal ground).

¶ 9 The above-cited cases required the trial court to evaluate both Mother's and Father's family units without emphasizing one over the other. The trial court failed to do so, and instead, it assessed the children's best interests by focusing on Mother's family as the primary custodial unit. The trial court's comments reflect this misguided view:

> [T]he best interests of the children must be viewed in light of the family central to their mother since she has primary custody. Given the constraints of being the only support for the family[,] the father does not contest that [Mother] is in the best position to have primary physical custody of the children. Therefore, it will be her family unit that will have the day-to-day routine and day-to-day emotional interaction between the parent and the children.

Trial Court Opinion, 3/1/02, at 6.

¶ 10 These comments reflect a fundamental misapprehension of Father's position. Father filed a petition for shared physical custody of the children. When Mother revealed that she intended to move with the children to South Carolina, Father sought primary physical custody. It defies logic to equate Father's agreement to an interim custody order with acquiescence to Mother's assumption of primary physical custody when Father sought custody of his children and proceeded to a custody trial. As Father noted in his brief, the interim custody order was precisely that: an interim order pending resolution of Mother's relocation request and Father's complaint for custody. As such, it was not a final order, it could not have

been the basis for an appeal, and it was meant merely to provide for the parties' rights pending a full custody hearing and during the pendency of the custody litigation. *Williams v. Thornton*, 395 Pa.Super. 276, 577 A.2d 215 (1990); *cf. Kassam v. Kassam*, 811 A.2d 1023 (interim custody order does not resolve all issues between the parties). The interim order clearly was not, as opined by the trial court, Father's agreement that "Mother is in the best position to have primary physical custody of the children." Trial Court Opinion, 3/1/02, at 6.

¶ 11 We believe the trial court confused the applicability of the "primary caretaker doctrine" with the proper focus when evaluating competing custodial environments in a relocation case. The "primary caretaker doctrine" requires the trial court to give positive consideration to the parent who has been the primary caretaker, and is one of many factors for the trial court to consider when determining the best interest of a child. *Wiseman v. Wall*, 718 A.2d 844 (Pa.Super.1998); *Wiskoski v. Wiskoski*, 427 Pa.Super. 531, 629 A.2d 996 (1993). The applicability of this doctrine is not the focus of Father's allegation of error. Rather, his issue concerns whether the trial court should have considered both parents' family units equally in determining the best interests of the children without emphasizing one over the other. The court failed to perceive the proper focus herein and abused its discretion in light of the applicable law.

¶ 12 Next, our review of the record also does not support the trial court's conclusion that Mother's life or derivatively, the children's lives, substantially would improve by moving to South Carolina. Intertwined with this issue is Father's assertion that realistic, substitute partial custody is not available, contrary to the trial court's

determination. We address these factors together.

¶ 13 The trial court determined that Mother's life would improve substantially by moving to South Carolina because she no longer would have to drive one hour each way every other month in order to obtain her health treatments, and further, she could rely upon her parents for help. First, the record does not support the conclusion that driving one hour each way to the doctor every other month is burdensome to Mother, despite her attempt to characterize it that manner. The record reveals that in the four months between her separation from Father and the custody hearing, Mother drove twelve hours from her home in Pennsylvania to Hilton Head, South Carolina, by herself with the boys, she drove six hours each way to Cincinnati, Ohio, she drove six hours each way to Washington, DC, she drove to Bethlehem, Pennsylvania, and she has driven to Dubois, Pennsylvania, once a week in the past. N.T., 1/10/02, at 88–89. Clearly, despite her protestation, Mother is able to drive much longer periods than the two hours required for doctor visits every other month.

¶ 14 Moreover, while Mother's parents testified that they would be available to help Mother if she moved to Hilton Head, the record reveals that they also are available for Mother under the present circumstances. From the date of the parties' separation until the time of the hearing, Mother's parents visited Pennsylvania or Mother visited Hilton Head every month. The parties separated in August 2001, and Mother's parents were in Pennsylvania for one week at that time. *Id.* at 83. Then, Mother and the boys drove to Hilton Head over Labor Day. *Id.* at 84. Mother's parents returned in mid-September for a three-week visit until early October. *Id.* At the end of October until early November 2001, they returned again for two weeks. *Id.* Mother visited Hilton Head over Thanksgiving for two weeks. *Id.* at 85. Her parents returned December 24, 2001, and remained in Pennsylvania at the time of the custody hearing, which was January 10 and 11, 2002. *Id.* Mother's mother, Judith Kosto, testified that she could provide transportation between Hilton Head and Clarion, and despite her preference, if the court determined the boys should stay in Pennsylvania, Mrs. Kosto would continue to help her daughter in Pennsylvania. *Id.* at 143, 146. Mr. Kosto would have testified similarly. *Id.* at 149.

¶ 15 Further, Mother's testimony that her brother, David, and his wife, who also reside in Hilton Head, would be available to help her if she moved was misleading in light of testimony that Mother visited South Carolina and David visited Pennsylvania without either of them visiting each other. *Id.* at 146; N.T., 1/11/02, at 210–11. Thus, the record reveals that Mother's parents are available to her whether she moves to Hilton Head or remains in Pennsylvania, and her brother likely would not be a reliable support.

¶ 16 Significantly, despite Mother's testimony that she does not have close friends in Pennsylvania but has mere acquaintances, and has no social life here, *see, e.g.,* N.T., 1/10/02, at 35, Sherry Bennett, the wife of the minister at Grace UC Church, testified that she and Mother are "closer as a support system in the area because neither of us—I don't have family here, so we rely on each other as we would do with family." *Id.* at 114. Moreover, Mother admitted to being an officer in the Clarion Civic Club, active in the Clarion Hospital Ambassador's Club, a bible study at church, and she organized a baby-sitting cooperative at church. *Id.* at 74–75.

¶ 17 Finally, Father testified that his mother and father baby-sit the boys and continue to be available for them. N.T., 1/11/02, at 202–04. Judy Marshall, Father's mother, testified that she is available to baby-sit and further, she telephoned Mother after the parties separated and offered to help Mother. *Id.* at 261–62. Thus, Mother's protestations notwithstanding, the record supports the conclusion that Mother was a vibrant member of her community who had a number of support systems in place.

¶ 18 Mother already has the support of her parents in Pennsylvania even though they are not here on a daily basis. By residing here, the children enjoy the benefit and support of Mother, Father, the maternal grandparents, and the paternal grandparents. Mother consistently has been a stay-at-home parent, so relocation would not provide Mother with additional time with the children at home. N.T., 1/10/02, at 92.

¶ 19 Undoubtedly, Mother desired to move closer to her parents after she asked Father to leave the marital home. However, for the reasons noted above, we cannot agree that this record supports the trial court's conclusion that Mother's life would improve substantially by moving to Hilton Head. In light of this conclusion, the children's lives similarly would not improve substantially. Mother seeks the emotional and physical support of her parents during a difficult time in her life, but the parental support she seeks is exactly the type of contact she would be restricting her sons from in relation to Father during a critical time in their childhood. The move unquestionably entails significant detriments to the children's relationship with Father, as highlighted below.

¶ 20 The trial court determined that Mother has shown a willingness to cooperate with Father in exercising visitation and "is willing to set up computer video cameras which [F]ather and the children can see as well as talk to each other through the computer." Trial Court Opinion, 3/1/02, at 7–8. While the Internet undoubtedly has fostered a myriad of ways for people to maintain communication and while computer video cameras allow people to "feel" closer even when separated by hundreds of miles, such technology cannot realistically be equated with day-to-day contact between parents and young children. *See Graham v. Graham, supra* at 915. ("[W]e disagree with the court's inference that staying connected via the Internet could ever be a substitute for face-to-face contact, ... particularly in a young child."). Such arrangements do not comport with realistic, substitute visitation. In light of the distance between Clarion, Pennsylvania, and Hilton Head, South Carolina, the record does not establish any realistic, substitute arrangement for visitation that adequately will foster the kind of ongoing relationship that Father and his sons have enjoyed. The boys' regular, substantial contact with Father simply cannot be sustained if they move such a distance away.

¶ 21 The trial court improperly focused on Mother as the primary custodial unit and failed to consider the possibility of the children living with Father. Moreover, the instant record does not indicate the move will improve the children's quality of life; it does support the conclusion that Jack's and William's best interests are not served by relocation to Hilton Head, South Carolina, and that substitute visitation via the Internet will not sufficiently foster the on-going relationship between the boys and Father. Since the record does not support the conclusion that Mother met her burden of proving that relocation was in the best interests of the children, we are constrained to reverse.

¶ 22 In sum, we conclude that the record does not support the trial court's conclusions regarding the *Gruber* factor relating to improvement of Mother's quality of life and derivatively, the children's lives. This erroneous conclusion was the basis for the trial court's determination that relocation was in the children's best interests, along with its equally mistaken assumption that Mother was the primary custodian based solely on entry of the interim consent agreement pending the hearing. *See* Trial Court Opinion, 2/28/02, at 9 ("Defendant has shown that moving to Hilton Head, South Carolina, would improve the quality of her life and **because she is the primary physical custodian of the two minor children the move would be in the children's best interests.**").

¶ 23 As noted *supra,* whether Mother has functioned as the primary caretaker is merely one of the factors for the court to consider when assessing the children's best interests. Whether Mother should be the primary custodian was a determination the trial court was to evaluate based on all of the evidence presented. The *Gruber* factors must be considered in light of the ultimate consideration, which is the best interest of the children. *Hurley v. Hurley, supra.* Such a determination must be premised on all factors that legitimately affect the child's physical, intellectual, moral, and spiritual well being. *McAlister v. McAlister, supra* at 391. Indeed, in light of Mother's desired relocation, the court was to focus upon which parent could provide a familial setting that would serve the children's best interest. Since the trial court merely focused its analysis upon assessment of the *Gruber* factors, we cannot say that a proper consideration of the children's best interests was accomplished.

¶ 24 Thus, upon remand, the trial court must consider a custody arrangement that promotes the children's best interests.

This determination must be made in light of our holding that the record does not support the conclusion that relocation would substantially improve Mother's or the children's quality of life. The trial court is free to consider additional testimony in light of the changed circumstances over the past year.

¶ 25 Order reversed; case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.

¶ 26 Judge JOHNSON Concurs in the Result.