R.M. v. N.F.

*Steven A. Bergstein,* for plaintiff
*Robert S. Frycklund,* for defendant

NANOVIC, *P.J.,* May 17, 2013—The state legislature in sections 5328(a) and 5337(h) of the Child Custody Act, 23 Pa.C.S.A. §§ 5328(a) and 5337(h), set forth sixteen custody and ten relocation factors to be considered by the court in deciding issues of child custody and requests for relocation respectively. Notwithstanding these checklists, the guiding principle in all child custody litigation is the best interests of the child. With this in mind, we review mother's appeal from our decisions denying her request to relocate and granting, in part, Father's request to modify the existing custody order.

## PROCEDURAL AND FACTUAL BACKGROUND

R.M. ("mother") and N.F., III ("Father") are the parents of one child together, Abygail, age six. The parties separated in July of 2008, when Abygail was two years old. In the meantime, both have developed new relationships and have married: Mother married her current husband, J.M. ("husband"), on January 21, 2011, with whom she has a sixteen-month-old daughter; and father married his current wife, A.F. ("wife"), on October 20, 2012. Father and wife do not have any children together.

Following their separation, the parties reached agreement on the terms of a custody order, which agreement was decreed as such on August 12, 2010. Under this order, the parties shared legal custody; mother held primary physical custody; and father was permitted supervised custodial rights every other weekend, on Easter Sunday and such other holidays as the parties could agree upon, and two weeks of uninterrupted vacation time.

At the time of the original custody order, Abygail was four years old. Approximately two years earlier, father had been involved in a motor vehicle accident, and sustained serious head and hip injuries. (N.T., p.116). It was because of these injuries and Abygail's youthful age that father's visits were agreed to be supervised. (N.T., pp.12, 60-61). The August 12, 2010 order required Abygail's paternal grandparents to be present at all times during father's visitations. Since father's marriage to wife, wife has also served as supervisor. (N.T., p.12).

This custody arrangement has worked well. Abygail is a healthy child, well cared for, and loved by both of her parents. She is in the first grade and doing well. (N.T., p.37). She has a good relationship with husband, wife, her half-sister, and father's parents, who live in a separate home from father's, on the family farm, approximately thirty yards away. (N.T., p.98). Father's grandmother lives immediately to the rear of father's home. (N.T., p.98).

Father's sister lives within approximately a mile and a half from father. Her daughter, Abygail's cousin, often plays with Abygail when Abygail is visiting her father. (N.T., pp.47, 101, 124, 164-65). Mother is an only child;

her mother resides in Hamburg, Pennsylvania. (N.T., p.45).

On March 15, 2013, father filed a petition for modification of the August 12, 2010 custody order. Therein, father sought more time with his daughter, "as the present partial custody schedule does not provide father adequate time to participate in the child's life in a meaningful way." Four days later, on March 19, 2013, mother gave notice of her intent to relocate to Florida in June, and proposed the custody schedule be modified to allow father to see his daughter twice a year — during the spring break from school and half the summer — and every other Christmas. Mother proposed father maintain his relationship with Abygail during the remainder of the year through phone calls using Skype or other video calling software. (N.T., p.33). Father objected to both the relocation and proposed change in custody schedule.

On April 16, 2013, we held a consolidated custody hearing on both mother's request for relocation and father's petition for modification. By order dated April 19, 2013, we denied mother's relocation request. That same day, we entered a modified order essentially continuing the existing custody order wherein mother retained primary physical custody, but eliminating the requirement that father's visits with his daughter be supervised, expanding the number of designated holidays throughout the year to be shared, and dividing the summertime equally between the parents. In the event mother nevertheless chose to move to Florida, we also entered an alternate order transferring primary physical custody to father, with mother to have visits every Thanksgiving holiday, for six consecutive

weeks during the summer months, and over the Christmas holiday for half of the school break.

Mother has appealed from our April 19, 2013 order.[1] In her concise statement which accompanied the appeal, mother has identified eleven issues which she intends to raise on appeal. These issues have each been addressed within the body of our discussion below. For the reasons which follow, we believe the best interests of Abygail have been furthered by our decision and would be dramatically adversely affected if mother were permitted to relocate to Florida with Abygail.

## DISCUSSION

### A. Custody Order, As Modified

To the extent mother questions the modified custody order, contending we have not thoroughly examined each of the sixteen factors set forth in section 5328, we have done so, albeit not explicitly. The April 19, 2013 order denying mother's request for relocation makes multiple findings of fact which we found to be significant in our determination. Expanding on these factors in the sequence set out by section 5328, we make the following findings and conclusions:

1. Both parents understand the importance of the other in Abygail's life and both have acted to assure that Abygail has a relationship with the other. Moreover,

---

1. As indicated, three orders were entered on April 19, 2013: one denying mother's request for relocation, one modifying the existing August 12, 2010 custody order, and one in the alternative in the event mother chose to relocate to Florida without Abygail. Mother's notice of appeal does not state which of these orders is being appealed from.

father has agreed to reduce his time with Abygail when this was in her best interests.

At the time the August 12, 2010 custody order was entered, Abygail did not attend school. (N.T., pp.10-11). The order provided father partial custody on alternating weekends from Saturday at 11:00 A.M. until Tuesday at 11:00 A.M. When Abygail began school the following year, father agreed to have his weekend visits end Sunday afternoon, rather than Tuesday morning. (N.T., pp.11, 49-50).

The converse has not happened. father's ability to develop a full relationship with his daughter has been limited by the requirement that father's visits be supervised. (N.T., pp.105-06).[2] While there was reason for this limitation to exist at the time the order was entered, due to the extent and nature of father's injuries and the age of Abygail, since then father's mind and body have markedly improved such that there is no need for father's visits with his daughter to continue to be supervised. (N.T., pp.113-15, 117, 125, 128, 131-36, 152, 157, 166-69, 181). Though mother has never precluded Father from visiting Abygail, she is unable to accept the improvement in father's health and is unwilling to allow father to have unsupervised visits. (N.T., p.80).

---

2. In response to mother's claim that father does not take full advantage of the two weeks he is allotted for vacation under the current order, father testified to the contrary. He did acknowledge, however, that in 2012 he was only able to use one week because neither his parents nor wife were available to provide supervision for the second week. Father rarely, if ever, has missed any of his alternating weekend visits.

2. There is no evidence that either parent currently or in the past abused the other or a member of their household.

3. Prior to father's motor vehicle accident in 2008, when Abygail was two years old, mother was Abygail's primary caretaker. (N.T., pp.8-9). At that time, father worked five days a week, Monday through Friday, between the hours of 9:00 A.M. and 6:00 P.M. (N.T., p. 9). Immediately following the accident, father's injuries prevented him from being a primary caretaker. During the beginning of father's recovery, father was cared for by his mother, who also helped in the care of Abygail when mother was at work. At the present time, father has the ability and desire to provide full-time care for his daughter.

4. At the present time, Abygail has a good, stable relationship with both of her parents and their spouses, as well as with her paternal grandparents. (N.T., p.101). She is doing well in school, especially in reading, and is involved in various activities. (N.T., pp.37, 40). The court believes it important that this stability continue.

5. Abygail's paternal grandparents live within yards of her father. Both have cared for Abygail in the past and acted as supervisors under the prior custody order. Abygail has a close relationship with her grandparents and visits them frequently whenever she is with her father. (N.T., pp.62, 165). Father's sister and grandmother also live nearby. (N.T., pp.101-03, 120-21; Respondent's exhibit 1). In contrast, the closest nearby maternal relative is Abygail's maternal grandmother

who lives in Hamburg, Pennsylvania.

6. Abygail's relationship with her half-sister was characterized as good, however, it must be remembered that Abygail's sister is only sixteen months old and Abygail is five years older. (N.T., pp.62, 158). No further detailed evidence was presented as to what Abygail and her sister do together.

7. At the request of the parties, the court did not interview Abygail. (N.T., pp.73-75). Nor was any other evidence presented as to her preference.

8. No evidence was presented that either parent has attempted to turn Abygail against the other.

9. The court finds that both parents are equally able and willing to maintain a loving, stable, consistent and nurturing relationship with Abygail adequate for her emotional needs.

10. The court finds that each parent is equally able and willing to attend to Abygail's daily physical, emotional, developmental and educational needs. There is no evidence of any special needs for Abygail. (N.T., pp.71-72).

11. The parties live within approximately fifteen minutes of one another. (N.T., p.45).

12. The court finds that each party is equally able to care for Abygail or to make appropriate childcare arrangements. Father is currently on social security disability and is available to care for Abygail. (N.T., p.118). Likewise, the court believes Abygail has

been well cared for by her mother and that she would continue to do so.

13. For the most part, the court finds both parties have communicated with one another and cooperated with one another in Abygail's best interests. Although mother testified that they do not communicate well, and that most forms of communication were previously with father's mother, and presently with wife, father testified that they do communicate with one another. (N.T., p.100). For instance, when mother first sought to set up a meeting to talk to father about relocating to Florida, she contacted wife to schedule this meeting without explaining the purpose. (N.T., p.63). Father was immediately in touch with mother to find out what she wanted to meet about. (N.T., pp.112, 140-41). Although mother's request to relocate has caused some friction in the relationship between mother and father, we believe this to be temporary. (N.T., p.36).

14. With the exception of mother's testimony that father's motor vehicle accident was alcohol related, there is no other evidence that either parent has abused drugs or alcohol, or has any substance abuse problems at the present time. (N.T., pp.76-77).

15. The only evidence of mental or physical limitations of any of the parties or members of their family are the injuries father sustained in the 2008 motor vehicle accident. As to the current status of these injuries, we find that father has made a good recovery and has no limitations at the present time that would affect his ability to safely care for Abygail or require that his

visits be supervised. (N.T., p.101). In this regard, we also note that father has an unrestricted driver's license. (N.T., p.99). Further, before his accident, father was a counselor with Kids Peace where he worked with children. (N.T., pp.160-61).

16. The only other relevant factor brought to our attention is that father and wife take Abygail to church and Sunday school during Abygail's visits with them. (N.T., pp.124, 165). Similar evidence was not provided by mother.

Based on the foregoing we concluded that Abygail's best interests would be served by continuing primary physical custody with mother, but giving additional time to father during the summer months, providing a better defined and more certain division of holiday visits, and removing the requirement that all of the father's time with Abygail be supervised. To the extent mother is objecting to this latter aspect of our April 19, 2013 decision, her objection appears to be centered on her belief that father continues to experience cognitive difficulties and physical limitations which could endanger Abygail if the visits are unsupervised. The record belies this fear.

In response to mother's testimony that father's cognitive abilities have not changed since 2010 and that he is unable to communicate and make decisions on his own, father testified that he was released from medical care and therapy in 2010, that he has made vast improvements mentally and physically since then, that his memory has increased, that he drives without any restrictions on his operating privileges, and that he has been looking for part-

474

time employment for the past five to six months. (N.T., pp.34, 52-53, 118-19, 131, 171). Wife, who is a licensed practical nurse and works with special needs children, testified that father has no limitations which would affect his ability to care for his daughter or require supervised visits. (N.T., pp.165-68). In our observations of father, although he had a slight limp and exhibited some minor forgetfulness, he was thoughtful and responsive to the questions asked. Mother presented no medical evidence to contradict father's testimony or that of wife, and we believe the record fully supports our finding of father's ability to safely have unsupervised visits with his daughter.[3]

B. Relocation

Section 5337(h) outlines the factors to be considered by the court in ruling on a proposed relocation. In the same sequence set forth in section 5337(h), we make the following findings and conclusions:

1. Abygail has a good and close relationship with both of her parents, and loves both. (N.T., p.170). Although the evidence establishes that mother was Abygail's primary caretaker until age two, and that both mother and the paternal grandmother cared for Abygail when

---

3. In *Ketterer v. Seifert*, 902 A.2d 533 (Pa. Super. 2006), the court commented on the deference to be accorded the trial court's observations and judgment as follows:

[W]e consistently have held that the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Id.* at 540 (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. super. 2004)).

father was unable to do so following his injuries in 2008, father now has the ability to care for Abygail and is active in her life during the times he is with her. Father walks, rides bike, watches movies, plays board games, fishes and goes on vacations with Abygail. (N.T., p.103). He is also interested in her school progress, assists her in homework, attends parent/teacher conferences, and goes online to view her grades. (N.T., pp.109, 128, 130, 148). Mother is likewise active in Abygail's life and has had primary custody of Abygail since the parties separated in 2008.

Abygail also has a good and close relationship with husband and wife. She further has a close relationship with her paternal grandparents with whom she has had frequent contact since her father was injured in 2008. Until her father's recent marriage in October of 2012, father's mother in particular had supervised father's visits with Abygail. Since then, Abygail sees her paternal grandparents every weekend she is with her father.

Although none of the details of Abygail's relationship with her half-sister were described, nothing was presented to believe that this relationship is other than that which would be expected between a sixteen-month-old infant and a sibling who is five years older.

2. At this time, Abygail is almost seven years old. Her birthdate is June 17, 2006. Both parties agreed that they preferred we not interview Abygail and we honored this request. There is nothing to suggest that Abygail is other than a typical six-year-old girl who is loved and

cared for by both of her parents; who gets good grades in first grade, especially reading; and who is involved in various activities, including weekly gymnastics, Daisies, and swimming lessons. (N.T., pp.19, 57-58). Given the distance of the move proposed by mother, and the close and frequent contact Abygail has had both with father and her paternal grandparents, there is no question but that these relationships would be weakened by the move.

Although Mother testified that the schools in Florida have five star ratings, father testified that the school Abygail now attends is a good one. (N.T., pp.37, 42, 106). There is no reason to believe that Abygail's physical, educational or emotional development would be better served in Florida than if Abygail continued residing in Carbon County.

3. Mother has suggested that if she were permitted to relocate with Abygail to Florida, father would be allowed to have visits with Abygail during the Easter holiday, for half the summer, and every other Christmas. (N.T., pp.54-55). Mother agreed that she would be responsible for the transportation expenses. (N.T., pp.33-34, 56). She further testified that she believed father could maintain continuing contact with Abygail through Skype or some other form of video conferencing.

The amount and quality of time father would be permitted to have with his daughter under mother's proposal is dramatically less than that which now exists. Presently, father exercises partial custody every

other weekend and is active with his daughter during these times. (N.T., p.75). He also testified that he takes his daughter to activities during the times she is with him and attends his daughter's activities on other times provided he is made aware of them. (N.T., pp.19, 58, 82, 99, 128-29).

It is also clear that father has a close relationship with his parents and his family. Father and wife, his parents, and his grandmother live on the family farm within yards of one another. His sister is approximately a mile and a half away. This is a close-knit family of which Abygail is an active member. She sees her grandparents whenever she visits with her father and she plays with her cousin, father's sister's daughter, during these visits.

4. For the reasons already stated herein, we did not question Abygail and no testimony was presented of her preference by either party.

5. From what we can determine, both parents encourage Abygail to have a good relationship with the other. However, as already stated, mother does not believe Father should be permitted to have unsupervised visits with his daughter. There is no evidence that either parent criticizes or denigrates the other in Abygail's presence.

6. At this time, the extent of any benefit of the relocation to mother is unclear and uncertain. The principal reason for the move is financial, for husband to find better employment. (N.T., pp.23, 36-37, 94).

Husband currently works as a security guard at St. Luke's Hospital, Allentown Campus, and makes approximately $33,000.00 a year. (N.T., p.91). Husband has a bachelor's degree in criminal justice and believes he is over-qualified to be a security guard. (N.T., p.31). While he would like to obtain employment in the fields of corrections, probation or law enforcement, he has been unsuccessful in locating employment in any of these fields in Pennsylvania. (N.T., pp.86-87). Husband has been interviewing for jobs in Florida and claims he has six strong prospects; however, to date husband has not been offered a job. (N.T., pp.42, 88-90).

Husband also claims that he would like to obtain his master's degree in criminal justice and that this will enhance his prospects for employment as well as higher pay. (N.T., p.91). To obtain this degree, husband attended a semester at West Chester College but did not pursue this course because of the time and expense of travel, roughly $400.00 to $500.00 per month, as well as $1,000.00 for the cost of tuition. (N.T., pp.68, 94). Husband testified he would like to pursue the degree at the University of Florida, near where his mother lives, and that the cost of this would be paid by one of his prospective employers, the State of Florida. (N.T., pp.68, 93). No evidence was presented that Husband has been accepted into the master's program for this degree at the University of Florida.

With respect to mother's employment as a nurse, mother testified that there is little difference in pay between her position in Pennsylvania and that which she hopes

to obtain in Florida. (N.T., pp.25, 29). She did state, however, that because Florida has no income tax, this would result in a financial benefit. (N.T., p.29). Also, that she believed any employment she would obtain as a nurse in Florida would be closer to where she would be living and, therefore, her travel time and expenses would be decreased. (N.T., pp.29-30, 66-67). Again, as of the date of hearing, mother had not secured nor been offered a job in Florida. (N.T., pp.42, 83).

7. Given the idefiniteness of mother's and husband's promise for employment in Florida, there is no clear financial benefit to Abygail from this move. Nor is there any evidence that mother and her husband are currently struggling financially or having any difficulty in making ends meet. Further, since mother's current employment in Pennsylvania is on weekends, freeing mother to spend weekdays with Abygail, and the work hours and work days of any employment she might obtain in Florida are unknown, there is a real possibility that any employment mother obtains in Florida will limit the number of hours she has available to be with Abygail. (N.T., p.7).

8. The principle reason mother has given for the move is financial. Yet, as already indicated, neither mother nor husband has secured employment in Florida. To the extent mother testified that her educational opportunities would also be expanded by moving to Florida, again, nothing definite has been planned or secured. (N.T., pp.30-31, 82).

Father is opposed to the relocation because if Abygail

is allowed to move, the time he can spend with Abygail will be lessened and the relationship he has worked to maintain will be weakened at a time when he is attempting to strengthen that relationship and become even more active in Abygail's life. (N.T., pp.112-13, 148-49, 150-51, 170).

9. There is no evidence that either party or a member of the parties' household has previously or is presently abusing another.

10. There are no other factors not already mentioned.

The foregoing addresses the first two issues raised by mother: a showing that the court is aware of and considered the relocation factors set forth in section 5337(h) and those custody factors set forth in section 5328(a). *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013) (holding that while the Custody Act requires the trial court to articulate the reasons for its decision prior to the filing of a notice of appeal, there is no required amount of detail; "all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations"). What is most important, however, is that the reason for considering these factors not be lost: to determine the best interests of the child. *Johns v. Cioci*, 865 A.2d 931, 936 (Pa. Super. 2004). "This standard requires a case-by-case assessment of all of the factors that may legitimately affect the 'physical, intellectual, moral and spiritual well-being' of the child." *C.M.K. v. K.E.M.*, 45 A.3d 417, 421 (Pa. Super. 2012) (quoting *Landis v. Landis*, 869 A.2d 1003, 1011 (Pa. Super. 2005)).

Implicit in our August 12, 2010 order modifying custody was that the best interest of Abygail was for primary physical custody to remain with mother provided she did not relocate to Florida. Our findings that Abygail is a happy, healthy, well-adjusted six-year-old; that Abygail has a strong, stable and beneficial network of family, friends and relatives in Carbon County; and that Abygail is doing well physically, mentally and emotionally, all support this decision. *Wiseman v. Wall*, 718 A.2d 844, 846 (Pa. Super. 1998) (stating that courts should be "reluctant to disturb custody arrangements which have satisfactorily served the best interests of the child.").

To the extent we eliminated the restriction that father's time with Abygail be supervised, the evidence and the facts found by us support this conclusion. Further, the more equal division of time between mother and father provided during the summer months and the broadening of the number of holidays recognizes the importance of developing fuller and better parent/child relationships by spending time together while celebrating special occasions and in having extended visits.

As to mother's decision to relocate to Florida with Abygail, the burden was upon mother to establish that relocation would be in Abygail's best interests. *See* 23 Pa.C.S.A. § 5337(i)(1).[4] On this issue, both mother and

---

4. In *Geiger v. Yeager*, 846 A.2d 691 (Pa.Super. 2004), the court stated the following which is clearly applicable in this case:

The majority of relocation cases we receive are difficult. As the *Gruber* court observed, these cases are wrought with "deep and almost irreconcilable competing interests" that our courts must balance in order to achieve the "right" result. *Gruber*, 583 A.2d at 437. The interests that we must accommodate are:

husband testified that the primary reason for the move was financial, to better Husband's employment and employment prospects.[5] Yet not only did neither husband nor mother have a firm job offer as of the time of hearing, the decision to move to Florida was made prior to engaging in any serious investigation concerning what employment and educational opportunities existed in Florida. (N.T., pp.64-65).

Discounting for the moment the speculativeness of the reasons given to relocate, even if husband had secured a better paying job and mother a comparable job to what she has now, and even if husband had applied for and was accepted into the master's program at the University of Florida, at most this would establish that mother's reasons for the move are realistic, and that mother will be better off financially. It does not establish, under the facts of this case, that a significant benefit would flow to Abygail. As to the personal happiness that might result for mother, "the personal happiness of [a] relocating parent cannot be the only or the predominant factor" in justifying a relocation.

the custodial parent's desire to exercise autonomy over basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children.

*Id.* At 438-39.

While a quick reading of these interests show that they do conflict with one another, it can also be seen that they all boil down to one thing: the best interests of the child.

*Id.* at 696.

5. As an incidental benefit, mother also noted the absence of a state income tax and the possibility that she might pursue graduate studies. As to the relative cost of living in Florida versus that which exists in Carbon County, no evidence was presented.

*Graham v. Graham*, 794 A.2d 912, 917 (Pa. Super. 2002).

Critical to this case is the non-economic factors that are at stake. With the possible exception of husband's mother, all of Abygail's family with whom she now has close personal ties are in Pennsylvania. While mother suggests that father could maintain his relationship with Abygail through two to three visits a year and internet communication, it is unrealistic to believe that such limited visits are a fair substitute for the frequent regular contact father now has with Abygail, or that video conferencing through the internet is the same as face-to-face contact, particularly with a young child. *Marshall v. Marshall*, 814 A.2d 1226, 1233 (Pa. Super. 2002).[6]

We do not question that Abygail has a good relationship with her mother. That it is a good and beneficial relationship was considered by us and was, without question, a factor in our decision to continue primary physical custody with mother, if she remains in Pennsylvania.[7] However, this

---

6. We are also aware that "[t]he fact that a move of a considerable distance will increase the cost and logistical problems of maintaining contact between the noncustodial parent and child will not necessarily preclude relocation when other factors militate in favor of it." *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006). On this point, the Court in *Dranko v. Dranko*, 824 A.2d 1215 (Pa. Super. 2003), further stated:

> The court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the [custodial parent] and children be forfeited solely to maintain weekly visitation by the [non-custodial parent] where reasonable alternative visitation is available and *where the advantages of the move are substantial.*

*Id.* at 1220 (emphasis in original) (quoting *Gruber v. Gruber*, 583 A.2d 434, 439-40 (Pa. Super. 1990)). The factors enunciated in *Gruber* are incorporated in the Section 5337(h) factors, specifically the third, sixth, seventh and eighth factors. *C.R.F., III v. S.E.F.*, 45 A.3d 441, 445 (Pa. Super. 2012). Here, the avowed advantages of the move are speculative at best and, in any event, not substantial.

7. In her appeal, mother complains that we have not given proper

is not the only relationship Abygail has. Her relationship with father is a good and important one, as is her relationship with her paternal grandparents, her father's extended family, and wife. While not considered a critical factor in a custody case, it is nevertheless a factor that father and wife are providing for Abygail's religious upbringing, with no evidence having been presented that mother does likewise. *See Zummo v. Zummo*, 574 A.2d 1130 (Pa. Super. 1990) (confirming the long-standing legal principle that the court will not interfere with the religious preferences of either parent). To find that all of this should be sacrificed, and that Abygail's progress in school, involvement in activities, and existing friendships, should be placed at risk, together with the concomitant potential dangers of disruption of established patterns, for what we believe has not been a well-thought out decision, is not in Abygail's best interests.

To the extent mother argues that our decision did not take into account Abygail's relationship with her half-sister, it d*id*. What is important in this analysis is that Abygail's half-sister is sixteen months old, Abygail is five years older, and the relationship which exists between them, while typical of that between a sixteen-month-old

---

consideration to her status as the primary caregiver of Abygail. In this regard, we first note that while "the primary caretaker doctrine requires the trial court to give positive consideration to the parent who has been the primary caretaker, and is one of many factors for the trial court to consider when determining the best interests of a child," *Marshall v. Marshall*, 814 A.2d 1226, 1231 (Pa. Super. 2002) (quotation marks omitted), the considerations encompassed by the doctrine have been "woven into the statutory factors, such that they have become part and parcel of the mandatory inquiry." *M.J.M. v. M.L.G.*, 63 A.3d at 339. "[T]he primary caretaker doctrine, insofar as it required positive emphasis on the primary caretaker's status, is no longer viable." *Id.*

and six-year-old sibling, does not carry the same weight as if Abygail's half-sister were closer in age to Abygail or the two had a more equally balanced relationship.

While the policy against separating siblings does not distinguish between half-siblings and siblings who share both biological parents, the policy is only one factor, and not a controlling factor, in the ultimate custody decision. *Johns*, 865 A.2d at 942-43. In *Johns*, the Superior Court stated:

> In the majority of cases in which this doctrine has been invoked, the children have been reared together prior to separation or divorce of the parents. In cases where the siblings have not been reared in the same household, the force of the doctrine is less compelling.

> In the present case, the child has never lived in the same household with her younger sister. Furthermore, the younger child was born to Father and step-mother following the divorce of Mother and Father. We do not believe that the divorced parent who has another child by a subsequent relationship should thereby be favored in a custody decision regarding any older children, based on the whole family doctrine. Such an application of the doctrine would imply an unacceptable policy: that the parent who subsequently has additional children with a different partner is automatically favored in a custody dispute. This would be blatantly unfair to the parent who, by choice or fate, has no additional children. We therefore refuse to extend the laudable whole family doctrine to the present facts.

*Id.* (citations omitted). Similar concerns exist here.

The driving force behind mother's decision to relocate to Florida is husband's desire to move to pursue his master's degree and to better his job prospects. That mother is supporting husband in this decision and desires to move with him is understandable. That the benefits to Abygail are uncertain and questionable are evident. That mother is aware of the risks involved was acknowledged, in a candid moment, when she confided to father that she was not happy with the move. (N.T., p.159).

## CONCLUSION

While there may be some potential advantages to mother and husband in moving to Florida, they are speculative, and far outweighed by the actual advantages which exist now and will continue to exist if Abygail remains in Carbon County. The record does not support a finding that the quality of Abygail's life will be substantially improved if she relocates to Florida with mother; that the strength and development of her relationships with father, wife, paternal grandparents, and father's extended family can be maintained or furthered by the custody arrangement proposed by mother; or that the best interest of Abygail will be served by relocating to Florida. In sum, mother has not met her burden of proving that relocating Abygail to Florida with her will be in Abygail's best interests.