# Metz v. Metz

*Max C. Feldman,* for plaintiff.
*Theresa Ferris-Dukovich,* for defendant.

DOHANICH, *J.,* April 13, 2007—The plaintiff/father, Keith A. Metz, has filed exceptions to the proposed order entered on August 8, 2005, affirming the previous orders of September 22, 2004, and April 5, 2005, awarding primary physical custody of the parties' son, J.M., to the defendant/mother, Tammy M. Metz, and partial custody to the father.

This action was initially commenced by the father with the filing of a complaint in divorce on August 2, 2004, by which he sought a divorce and equitable distribution of marital property. To said complaint, the mother, on August 10, 2004, filed an answer and counterclaim, including a count for custody of the parties' minor child. On August 12, 2004, the mother filed a petition for exclusive possession of the marital residence, for which the court granted her interim relief and scheduled a hearing for August 17, 2004. At the time scheduled for the hearing, the parties entered into and the court issued a consent order continuing, in effect, exclusive possession of the marital residence by the mother.

On August 17, 2004, the mother filed a petition for custody and the father filed a counterclaim for custody. On said date, the father also filed an emergency petition for special relief, alleging that the mother was exposing the child to individuals she was dating, and seeking an award of interim custody, which was denied by the court. A custody conference was scheduled for September 1, 2004, and rescheduled by consent of the parties to September 15, 2004. Following the custody conference, a proposed order was entered on September 22, 2004,

which granted primary physical custody of the child to the mother and awarded partial custody to the father every other weekend from Friday at 6 p.m. until Sunday at 6 p.m., and on Tuesday and Thursday from 5 p.m. until 8:30 p.m. during the weeks that the father did not exercise weekend visitation. The proposed order also provided for the sharing of holidays and summer vacation, and further directed the parties not to disparage each other or discuss custody issues in the presence of the child. Both parties were ordered to complete the transparenting seminar through Catholic Charities.

Exceptions to said proposed order were filed by the father on October 4, 2004, alleging that the order was not in the child's best interest and that the father had been the primary caretaker prior to separation of the parties. The father, on November 30, 2004, filed a petition for contempt averring that the mother was preventing telephone contact by the father with the child. The court scheduled both a pretrial conference on the father's exceptions and a contempt hearing on the father's petition for February 11, 2005. Following said pretrial conference, at the request of the parties, the court scheduled a second pretrial conference for April 5, 2005. As a result of the second pretrial conference, the court entered an order on April 5, 2005, establishing the telephone contact time for the father, providing a location for the exchange of the child, dismissing the father's contempt petition and entering the September 22, 2004 order as a final order.

On July 19, 2005, the father filed the instant modification petition, the basis of which was that J.M. should continue to reside in Hopewell Township and attend the Hopewell Area School District. A custody conference

was conducted on August 3, 2005, following which a proposed order was entered on August 8, 2005, providing that the previous orders of September 22, 2004 and April 5, 2005, remain in effect without modification. From this proposed order, the father filed exceptions alleging that the order was not in the child's best interest and the custody officer failed to fully consider all the evidence.

By order of September 12, 2005, the court scheduled a pretrial conference for November 9, 2005, on the father's exceptions. A second pretrial conference was scheduled by order of December 5, 2005, to be held on February 22, 2006, with the trial scheduled for March 23, 2006. On December 5, 2005, the court also entered an order by agreement of the parties to have a psychological evaluation of the child and the parents conducted by Mark King, Ph.D. A consent order was issued on February 22, 2006, rescheduling the pretrial conference to May 2, 2006, and the trial to May 16, 2006, due to the psychological evaluation having not been completed. The pretrial conference was again rescheduled by order of April 27, 2006, to June 5, 2006, and the trial was rescheduled to June 29, 2006, because Dr. King required additional time to complete his report.

The father filed a petition for special relief on May 16, 2006, for which the court issued an order directing that the mother's daughter by a prior marriage and the parties' son be made available for interview by Dr. King. A motion to continue the trial was presented by the father on June 22, 2006, by reason of the unavailability of Dr. King, and the trial was rescheduled to August 10, 2006. The court again continued the trial at the request of new counsel for the mother by order dated August 3, 2006, to October 19, 2006. The court, sua sponte, rescheduled

the trial to October 24, 2006, at which time both parties were present with counsel and presented evidence. Said hearing was not concluded and subsequently resumed on November 20, 2006, and February 26, 2007, when the proceedings were completed.

## FINDINGS OF FACT

(1) The father, Keith A. Metz, is 37 years of age and resides alone in Hopewell Township, Beaver County, Pennsylvania.

(2) The father has resided at his present address since July 1, 2005.

(3) The father's residence is a condominium consisting of two bedrooms, a kitchen, a dining room, a living room and a basement containing 1,100 square feet.

(4) The father is a high school graduate who also attended trade school and has earned a certificate as a machine shop technician.

(5) The father is employed with R & T Machine in Ambridge, Pennsylvania, as a machinist, where he has worked for approximately 12 years and presently earns $21 per hour.

(6) The father's hours of employment are from 8 a.m. until 4:30 p.m., Monday through Friday.

(7) Until June 2005, the father's employer provided health insurance for the entire family; however, the father's employer, due to a substantial increase in cost, currently carries health insurance only for the father.

(8) The father is presently in good health.

(9) The father has failed to complete the transparenting seminar as required by the proposed order.

(10) The father's mother, D.M., resides in Kennedy Township, Allegheny County, Pennsylvania.

(11) The father's father lives in Erie, Pennsylvania.

(12) The mother, Tammy M. Metz, age 37, resides in Ohioville, Beaver County, Pennsylvania.

(13) The mother has resided with the parties' minor son, J.M., at said address since June 2005.

(14) When relocating to her current residence with J.M., the mother failed to advise the father of her new address; the father learned of the relocation through the parties' son.

(15) Since the mother's relocation to Ohioville, the parties have mutually agreed that the custody exchange take place at the Midland Post Office in Midland, Pennsylvania.

(16) The mother's current residence is leased from her landlord and consists of a single-family dwelling composed of two bedrooms, a kitchen, a living room, a bathroom and a laundry room; attached to the residence as a separate unit is an efficiency apartment in which the landlord occasionally resides.

(17) The mother became acquainted with the landlord in her capacity as a real estate agent in the transaction by which he purchased the real estate in which the mother and J.M. presently reside.

(18) The mother denies a romantic involvement with the landlord.

(19) The mother has established a romantic relationship with a male individual who resides in Pittsburgh, Pennsylvania.

(20) The male individual and the landlord were involved in a physical altercation on October 12, 2006, resulting in the landlord being charged with assault.

(21) In December 2005, the mother's male companion was charged with harassment for posting offensive electronic mailings regarding the father.

(22) The mother is a high school graduate who was trained in cosmetology and later obtained a license to sell real estate.

(23) The mother previously worked as a hair stylist and as a real estate agent.

(24) The mother is presently unemployed and has filed for Social Security disability on the basis of a neck injury sustained in an automobile accident and for which she is prescribed medication.

(25) The sole source of income for the mother is the support paid by the father and the receipt of food stamps, a medical card and assistance with housing.

(26) Pursuant to the order entered February 15, 2007, at case no. 846 DR 04, the father is obligated to make payment to the mother of $598 per month as spousal support and $650 per month as child support, for a total of $1,248 per month, based upon the father's net monthly income of $2,642 and the mother's net monthly income of $0.

(27) The divorce action between the parties remains pending.

(28) The mother completed the transparenting seminar through Catholic Charities on February 2 and 16, 2005, as required by the proposed order.

(29) The mother's mother lives in Crafton, Allegheny County, Pennsylvania.

(30) The mother is the parent of a daughter, L.F., age 18 (date of birth: November 24, 1988), by her previous marriage to S.F.

(31) L.F. resided with the mother until August 2004, when she relocated to live with her father in McKees Rocks, Allegheny County, Pennsylvania.

(32) L.F. presently attends Sto-Rox High School where she is enrolled in the twelfth grade as an honor student; she is also presently employed.

(33) L.F. currently resides alone in her own apartment.

(34) The mother and L.F. presently maintain a close relationship.

(35) The parties were married on May 6, 1994.

(36) This marriage is the first for the father and the second for the mother.

(37) One child was born of this marriage—J.M., age 13 (date of birth: March 9, 1994).

(38) At the time of J.M.'s birth, the mother was married to her first husband, S.F., which marriage survived for one and one-half years and concluded in a divorce.

(39) J.M. is enrolled in the seventh grade at Western Beaver School District, where he is in his second year of attendance.

(40) J.M. previously attended the Hopewell Area School District from kindergarten through the fifth grade.

(41) J.M. has experienced academic difficulties, scoring grades in the average to below average range; how-

ever, he has shown improvement in the most recent grading period from October 31, 2006, through January 19, 2007.

(42) J.M. has made a good adjustment in the Western Beaver School District in his relationship with his peers and teachers, and he has not been the subject of any discipline in the school setting.

(43) J.M. continues to participate in baseball and football in the Hopewell Township area and maintains relationships with his peers from his former school and neighborhood.

(44) J.M. attends religious services with his mother at the Assembly of God Church and is active in bible study each Wednesday from 3:30 p.m. until 8 p.m.

(45) J.M. maintains a regular relationship with his paternal grandmother.

(46) The parties, together with their son J.M., and the mother's daughter, L.F., resided as a family at the former marital residence located in Hopewell Township, Beaver County, Pennsylvania, from March 1997, through April 2004.

(47) The parties initially separated in April 2004, reunited during the period of the mother's surgery, and finally separated in July 2004.

(48) The father returned to the marital residence on August 6, 2004, during which an argument ensued between the parties and for which the police were summoned, all in the presence of J.M.

(49) The August 6, 2004 incident resulted in the mother filing (1) a petition for protection from abuse against the father at case no. 70298 of 2004, which was denied on August 9, 2004, and (2) a petition for exclusive

possession of the marital residence on August 12, 2004.

(50) From July 2004 through July 2005, the father resided with his mother.

(51) The father claimed that he returned to reside in Hopewell Township in order that J.M. could remain in the Hopewell Area School District and because J.M. indicated that he wanted to reside in Hopewell Township to continue his relationships with his friends.

(52) The mother's daughter, L.F., relocated from the former marital residence in August 2004, to live with her father, S.F., in McKees Rocks, Pennsylvania.

(53) The father financially assisted S.F. with payment of counsel fees for the purpose of presenting a petition to transfer custody of L.F. from the mother to L.F.'s father, which was submitted to the court on August 17, 2004, the same date that the father filed a petition for emergency relief requesting an award of interim custody of J.M.

(54) Counsel for the father also represented L.F.'s father, S.F.

(55) On August 15, 2004, the father, L.F.'s father and her stepmother were all present when L.F. was asked to prepare a handwritten letter expressing her desire to reside with her father prior to the presentation of the custody petition by L.F.'s father.

(56) The mother and J.M. continued to reside in the former marital residence until February 2005, when it was sold.

(57) From February 2005, through June 2005, the mother and J.M. resided in Clinton, Beaver County, Pennsylvania, which was located within the Hopewell

Area School District, and which permitted J.M. to complete the school year in Hopewell.

(58) Since June 2005, the mother and J.M. have resided at their current address in Ohioville, Pennsylvania.

(59) Prior to relocating, the mother sought to procure a residence within the Hopewell Area School District in order for J.M. to continue his education within the same school system; however, she alleges that she was unable to obtain lodging in the area of the school district within her financial means.

(60) On December 19, 2003, the parties were involved in a physical altercation in the presence of J.M. to which the police responded, resulting in criminal charges of simple assault, recklessly endangering another person and disorderly conduct being filed against the father, and for which he was incarcerated.

(61) The charges filed against the father were subsequently dismissed when the mother failed to appear to testify against the father and the parties reconciled.

(62) Subsequent to the parties' separation in the summer of 2004, the parties were involved in a verbal altercation at an all-star baseball game in which J.M. was to participate, resulting in the mother removing J.M. from the game and departing from the area.

(63) The above argument also involved the father's mother, on whose behalf the father filed charges against the mother, which were subsequently dismissed when the father's mother failed to appear for the hearing.

(64) Following the separation, the father claimed that the mother prevented him from visiting with J.M. for a period of 35 days.

(65) Prior to the custody conference, the parties had established a weekend visitation schedule for the father.

(66) On one such weekend, the father refused to return J.M. to the mother until the following Wednesday.

(67) From September 2004 through February 2005, the father failed to exercise the weekday visitation as provided in the original order of September 22, 2004.

(68) During the period shortly following separation, the father, during four separate telephone conversations in which the mother was requesting assistance with difficulties being experienced by J.M., used vulgar and derogatory language toward the mother.

(69) Prior to separation, both parties participated in activities with J.M., assisted him with his homework and generally provided for his well-being.

(70) Since the separation, both parents provide activities for J.M., such as swimming, riding bicycles, playing various games and shopping.

(71) The father is active with J.M. in baseball and football.

(72) Both parents have participated in parent-teacher conferences and maintain contact with school representatives to assist J.M. academically.

(73) The parties rarely communicate directly or on the telephone and have resorted solely to electronic mail to contact one another.

(74) The father has refused to provide the mother with his telephone number.

(75) In March, April and May 2006, the father, the mother and J.M. were all evaluated by Dr. Mark King, who prepared a report and testified at the hearing.

## DISCUSSION

The thrust of the father's modification petition is that J.M.'s best interest would be fostered by residing in Hopewell Township and attending the Hopewell Area School District. The mother, on the other hand, asserts that the parties' son has adjusted well to the new neighborhood and school, and therefore, the current custody arrangement should remain in effect. She, however, has indicated a willingness for J.M. to spend additional time with his father.

In addressing the father's position, the court is guided by the provisions of the Domestic Relations Code, 23 Pa.C.S. §5303(a), which sets forth the general rule regarding custody of children, as follows:

"(1) In making an order for custody or partial custody, the court shall consider the preference of the child as well as any other factor which legitimately impacts the child's physical, intellectual and emotional well-being.

"(2) In making an order for custody, partial custody or visitation to either parent, the court shall consider, among other factors, which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the noncustodial parent and the child.

"(3) The court shall consider each parent and adult household member's present and past violent or abusive conduct which may include, but is not limited to, abusive conduct as defined under the act of October 7, 1976 (P.L. 1090, no. 218), known as the Protection From Abuse Act."

The paramount concern in a child custody case is the best interest of the child, based on a consideration of all

factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being, and this determination is to be made on a case-by-case basis. *Dranko v. Dranko,* 824 A.2d 1215 (Pa. Super. 2003).

In considering a request for modification, courts are reluctant to disturb an existing custody arrangement which has satisfactorily served the best interest of the child. *Dolan v. Dolan,* 378 Pa. Super. 321, 548 A.2d 632 (1988). A party seeking to modify an existing custody arrangement must prove that the requested changes are in the child's best interest. *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992). A modification of custody is not warranted merely because one or the other parent is unhappy with the current arrangement. *Jackson v. Beck,* 858 A.2d 1250 (Pa. Super. 2004).

The father suggests certain factors, to justify an award of primary custody of J.M. with him. First, the father emphasizes that J.M. resided with his parents in Hopewell Township from the time he was approximately 3 years of age until the age of 10 years, and attended the Hopewell Area School District from kindergarten through the fifth grade. As a result, J.M. was familiar with his community, formed friendships and established himself in the school district. In addition, during the period of separation, he has maintained relationships with his peers in Hopewell when visiting with his father and by continuing to participate in baseball and football. The father alleges that he relocated to Hopewell in order to accommodate J.M.'s express desire to live and attend school in Hopewell. The father claims that J.M.'s academic performance has deteriorated since attending the Western Beaver School District.

The argument made by the father that continuing primary custody with the mother would disrupt the child's life, primarily because he must change school districts, was made in the case of *Swope v. Swope,* 455 Pa. Super. 587, 689 A.2d 264 (1997). The Superior Court in *Swope, supra,* declared that while continuity in school is an important factor and must be considered, it, like any other single factor, is not controlling. See also, *Fox v. Garzilli,* 875 A.2d 1104 (Pa. Super. 2005). The significance of the father's argument is substantially diminished by the fact that J.M. has resided in Ohioville and attended school at Western Beaver School District for nearly two years. According to his teachers, he has adjusted well to his peers, teachers and school. Although he initially encountered difficulty academically, his performance has improved. In reviewing J.M.'s report cards as submitted by the parties, the father provided J.M.'s grades for the first two grading periods while in the fifth grade at Hopewell Memorial Junior High School from August 2004 through January 2005, which indicated that he was performing above average but put forth little or no effort. No information was submitted for the third and fourth grading periods for fifth grade. The mother produced J.M.'s report card for the first two grading periods in grade seven at Western Beaver Junior High School from August 2006 through January 2007, which displayed average to below average grades. Neither party presented evidence of J.M.'s grades for the 2005-2006 school year. The mother testified that she investigated the Western Beaver School District prior to relocating and found it to be smaller in size but comparable to the Hopewell Area School District in quality. The father presented no evidence to the contrary. J.M. has adapted

to a new neighborhood and school and established new friendships. Requiring him to return to Hopewell Township would result in the disruption of the stability which has been achieved by the present arrangement and would be contrary to his best interest.

The father next avers that J.M. has expressed his preference in returning to Hopewell Township and the Hopewell Area School District. Although the express wishes of the child constitute an important factor that must be carefully considered in determining the child's best interest, such desires are not controlling in custody decisions. *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992). The child's preference must be based on good reasons, and the child's maturity and intelligence must also be taken into account. *McMillen v. McMillen, supra.* The observations of Dr. King in this regard are very insightful. Dr. King noted that although J.M. expressed a desire to live with his father, this request was not necessarily a preference for the father over the mother, but an appeal to return to the Hopewell Area School District. Dr. King further indicated that J.M. is at an age when friends are more important than parents, and he frankly prefers to return to his friends. The mother has not denied J.M. access to his friends from their former neighborhood as is evidenced by her giving permission for him to continue to participate in athletics in Hopewell. J.M.'s stated preference is understandable. However, similar wishes of the children in *Ellingsen v. Magsamen,* 337 Pa. Super. 14, 486 A.2d 456 (1984), were determined by the court to lack sufficient basis to be accorded controlling weight.

The father disputes that the mother was forced to relocate to Ohioville for financial reasons. He claims that

she chose her current location in order to reside with her alleged boyfriend and landlord. The father produced a copy of a joint checking account bank statement disclosing a balance of $16,801.07 as of October 30, 2004. At the time of final separation in July 2004, the parties were the owners of a savings account containing $11,600. The father testified that he removed $5,000 and left the balance of $6,600 for the mother. He further indicated that $1,800 remained in the parties' checking account and available for the mother. The father also stated that the mother purchased a new vehicle after separation.

In response, the mother advised that at the time of separation the parties had agreed on an amount that the father would pay in support. The father made one payment to mother in the amount of $200. The mother therefore filed a complaint in support on July 30, 2004, which resulted in an order dated September 22, 2004, directing the father to pay support in the amount of $711 per month plus $50 per month on the arrears based upon the father's net monthly income of $2,913 and the mother's net monthly income of $1,500. The mother did not actually receive any support until mid-October 2004, by which time she was delinquent on her monthly expenses, including the mortgage and utilities.

The father last made a mortgage payment in July 2004. The amount of the monthly mortgage payment was $844. No mortgage payments were made from September 2004, through February 2005, when the marital residence was sold. From the proceeds of the sale of the real estate, the mother received only the sum of $1,036 as a credit on the support arrears due from the father. The mother and J.M. then relocated to the Clinton address from February through June 2005, where the rent was $550 per month,

and to the Ohioville location from June 2005 to the present, where the rent was initially $500 per month and is presently $525 per month. The mother has qualified for food stamps, a medical card and housing assistance. She testified that of the $16,801.07 which was on deposit as of October 2004 in the parties' savings account, $10,000 was borrowed in the form of a cash advance from Household Finance to cover her then current and delinquent expenses, since she had little or no income from the time of separation in July 2004, until the first receipt of support payments in October 2004. As for the purchase of the new automobile, the mother advised that by paying off the loan on the old vehicle and acquiring the new car, she was able to reduce her monthly payments from $328 to $271. The mother further indicated that she attempted to find a suitable residence within the Hopewell Area School District, but the monthly rentals were beyond her financial means and/or were not eligible for housing assistance. The mother also denied any romantic relationship with her landlord, although he is regularly present at the mother's residence as the owner and as an occasional resident of the efficiency apartment attached to the home. She admits to being romantically involved with the male individual. The mother remains unable to work due to her medical conditions. She was in the position of being unable to be employed as a result of medical issues and relying solely on support payments to pay monthly expenses for herself and J.M. Through a prior association with the landlord and a familiarity of the property which she previously sold to him and which qualified for housing assistance, she made the choice to relocate. The bulk of the funds in the savings account were borrowed monies which the mother was required

to use for delinquent and current expenses. The above circumstances do not indicate an intent on the part of the mother to relocate solely for the purpose of a romantic relationship.

The mother alleges that she has been, and continues to be, the primary caretaker for J.M. This assertion is certainly true since the separation of the parties. The primary caretaker doctrine requires the court to give positive consideration to the parent who has been the primary caretaker of the child in order to determine what is in the child's best interest. *Marshall v. Marshall,* 814 A.2d 1226 (Pa. Super. 2002). When both parents are otherwise fit, one parent's role as the child's primary caretaker may be given weight as a determining factor by the court. *Mumma v. Mumma,* 380 Pa. Super. 18, 550 A.2d 1341 (1988). The mother has principally been responsible for J.M.'s day-to-day necessities, as well as attending to his educational, religious and medical needs. She is not employed outside the home and is available for her son at any time. The father is employed full-time working from 8 a.m. until 4:30 p.m., Monday through Friday. A parent's work schedule may not deprive that parent of custody if suitable arrangements are made for the child's care in the absence of the parent. *Gerber v. Gerber,* 337 Pa. Super. 580, 487 A.2d 413 (1985). The father's testimony was vague in describing the provision of an appropriate caretaker for J.M. He indicated that his mother, who lives in Kennedy Township, Allegheny County, or friends would be willing to assume responsibility for supervision of J.M. when the father is unavailable. Under the circumstances of this case, the mother is entitled positive consideration as the primary caretaker of J.M.

As noted previously, the Domestic Relations Code requires the court to consider the following additional factors in a custody action: (1) which parent is more likely to encourage frequent and flexible access between the non-custodial parent and the child; and, (2) whether either parent has exhibited past and present violent or abusive conduct. After separation, both parties were guilty of withholding the child from the other. The mother failed to advise the father that she had relocated from Clinton to Ohioville and denied access to the father for approximately one month. The father thereafter refused to return J.M. following a weekend visitation after the parties had established a visitation schedule. In both situations, the parties each sought court intervention. Since the original order has been in place, both parties have complied with the custody arrangement set forth in the initial order, but there is no indication that either party has extended courtesies to the other beyond the conditions prescribed by the court. Following separation, the mother attempted to contact the father seeking assistance with problems that J.M. was experiencing, and the father's response was to leave derogatory telephone messages on her answering machine deriding her in vulgar terms. The father also interjected himself into the custody matter between the mother and her former husband involving the mother's daughter, L.F., by providing financial assistance to L.F.'s father for counsel fees in the filing of a custody petition on August 17, 2004, the same day that the father filed a petition for special relief regarding J.M. The father prompted L.F. to prepare a letter describing the conduct of the mother and provided L.F. with the information to insert in said correspondence for review by the court. Counsel for the father also represented S.F., the father of L.F. The father has refused to

provide the mother with his telephone number and insists on communicating by use of electronic mail. The mother, on the other hand, has permitted J.M. to continue to participate in athletics in Hopewell Township and has indicated a willingness to provide additional time for J.M. to spend with his father. Dr. King advised that the mother was making a clear attempt to cooperate with the father but he did not reciprocate. Despite the filing by the father of a contempt petition in order to enforce telephone contact with J.M., who is in possession of a cellular telephone, there is little or no telephone communication between the father and his son.

The father has exhibited a history of violent physical and verbal abusive conduct toward the mother in the presence of both J.M. and L.F. Physical abuse was inflicted upon the mother on December 19, 2003, in the presence of the children and for which the father was incarcerated and charged with various criminal offenses. A verbal confrontation occurred on August 6, 2004, while J.M. was present and for which the police were called. Dr. King confirmed the father's violent behavior and indicated that the father had nothing good to say about the mother. The mother, however, portrays the father in a positive light, despite the physical and verbal abuse. Dr. King reported that the most important variable in this case is the domestic violence inflicted by the father upon the mother. The above conduct of the father does not demonstrate that the best interest of J.M. would be served in awarding him primary custody.

Dr. King declined to make a recommendation regarding custody in this case because each of the parents is very flawed in ways that hurt the child. The facts of this case make evident that the primary purpose of the parties

in this custody action is to attack one another and not focus on what is in J.M.'s best interest. Dr. King advised that both parents are engaging in destructive behavior in terms of the best interest of J.M. The lack of appropriate communication between the parties is certainly detrimental to J.M. To the inquiry of how the present situation could be improved, J.M. responded that his parents should cooperate. The court notes that the mother is not completely without fault. The incident involving the paternal grandmother at the all-star baseball game in J.M.'s presence and the circumstances surrounding the mother's boyfriend sending electronic mail degrading the father are two significant instances of the mother's adverse behavior. Although the actions of the mother are not favorable, they do not rise to the degree of the father's abusive conduct.

Upon careful consideration of the foregoing, the court determines that the father has not met his burden of proving that the requested modification of primary custody is in J.M.'s best interest. The court will, however, grant a modification of the summer vacation schedule to provide that each party shall exercise partial custody on an alternating weekly basis commencing with the first full week at the conclusion of the school year. This amended schedule will afford the father the opportunity to maintain regular contact with J.M. during the summer recess from school and is consistent with the mother's offer to provide the father with additional time with the child.

The court acknowledges receipt of correspondence from counsel for the father dated March 30, 2007, indicating that the mother and J.M. will relocate from Ohioville to Beaver, Pennsylvania. Since neither party has submitted any evidence on the record regarding such a

relocation, the court declines to consider this allegation.

Based on the foregoing, the court enters the following order:

## ORDER

And now, April 13, 2007, it is hereby ordered and directed as follows:

(1) The summer and/or school vacation schedule as set forth in paragraph II.D. of the order of September 22, 2004, is amended to read as follows:

"Commencing one week after completion of the school year until one week prior to the beginning of the following school year, the parties shall alternate custody of the minor on a weekly basis. The day of the week upon which said partial custody is to begin shall be as the parties agree in the best interest of the minor."

(2) Paragraph 2 of the order of April 5, 2005, is amended to provide that the location for the exchange of the child is the Midland Post Office, Midland, Pennsylvania.

(3) The father is directed to enroll in and complete the transparenting seminar through Catholic Charities, 1260 Brodhead Road, Monaca, Pennsylvania 15061, telephone number (724) 775-0758, and to file a certificate of completion with the prothonotary's office within 30 days of the date of this order.

(4) In all other respects, the orders entered September 22, 2004, and April 5, 2005, shall remain in full force and effect to the extent that they are not inconsistent herewith. Copies of said orders are attached hereto for the benefit of the parties. [Not published herein.]