## Cross v. Cross

*Anne L. Carroll* and *Sharon L. Gray,* for plaintiff.
*Ron Creazzo,* for defendant.

LASH, *J.,* August 14, 2008—This court held a child custody trial on July 1, and August 8, 2008. We make the following findings:

## I. FINDINGS OF FACT

(1) Plaintiff, Scott Cross (Father), is an adult individual who resides in Mount Aetna, Berks County, Pennsylvania 19544, in the Tulpehocken School District.

(2) Defendant, Debora Cross (Mother), is an adult individual who currently resides at 126 37th Street NE,

Cedar Rapids, Iowa, within the Cedar Rapids School District.

(3) The parties are the natural parents of five children: Elisha Cross, born December 13, 1992, Abigail Cross, born November 16, 1994, Montgomery Scott Cross, born October 7, 1996, Marissa Cross, born August 14, 1998, and Annika Cross, born September 8, 2000, (minor children).

(4) The parties were married in 1991, residing together until their separation in August 2007.

(5) From 1996 through the parties' separation in 2007, the parties resided in the marital residence, which is now Father's residence in Mount Aetna, except for a one and one-half year period in 1999 and 2000 when the parties resided in California.

(6) There is currently a divorce action pending in Berks County Court, filed by Father.

(7) Mother is also the parent of two adult children from her first marriage, James Cleland and Vana Goddard, both of whom resided with the parties for a period of time.

(8) Father is currently employed at R R Games in Birdsboro, Pennsylvania 19508, having been employed full-time until recently when he was placed on partial layoff, now working Tuesdays and Thursdays. As a result, he has supplemented his income through independent contracts with other companies, including Shay's Vending in Lebanon in Pennsylvania and Keysource Technologies in Kutztown, Pennsylvania.

(9) With the exception of some minor jobs, Mother has been employed as a homemaker.

(10) The parties' marriage quickly deteriorated and ultimately broke down after the parties engaged in a practice called "polyamory", commonly known as wife swapping, in which the parties and another couple, named the Pimlotts, who reside in Iowa, convened at the marital residence and engaged in consensual sexual acts with each other.

(11) The parties met the Pimlotts on the internet. While it is unclear which of the parties initiated the contact, both parties agreed to participate and did participate.

(12) After engaging in the group sex, Mother and Jason Pimlott formed a bond.

(13) The parties and the Pimlotts discussed the parties moving to Iowa to cohabit at the Pimlotts' residence. However, Father and Mrs. Pimlott apparently did not bond, so the suggestion was then made to have Father reside in a separate residence near the Pimlott residence while Mother would reside with the Pimlotts.

(14) The proposed arrangement would include the parties' children residing in the Pimlotts' residence, as well as the Pimlotts' two children, ages 6 and 4.

(15) Father declined to move to Iowa. Mother then chose to move to Iowa without Father and did so on August 18, 2007.

(16) When Mother moved to Iowa, she took the minor children, Abigail and Annika. Apparently, the parties had offered the children the option on whether they would move to Iowa or stay in Pennsylvania. Elisha, Scotty and Marissa chose to stay in Pennsylvania, Abigail chose to move to Iowa, and Annika did not choose and ultimately moved with Mother.

(17) The aforesaid custody arrangement remained in place until December 30, 2007, when Mother returned to Pennsylvania and retrieved the other three children, moving to Iowa to reside with her other two children and the Pimlott family.

(18) Since December 30, 2007, all five children have resided with Mother in Iowa, except for a short period during the spring break, when the children returned to Berks County to visit with Father. Additionally, the parties agreed that Elisha and Scotty would spend the entire summer of 2008 with Father, and Abigail, Marissa and Annika would reside with Father from July 1, 2008 until the end of the summer.

(19) Currently, Mother resides with her paramour, Jason Pimlott, the five minor children, the Pimlott children, Joseph, born September 26, 2001, and Caleb, born October 23, 2003. Jason Pimlott's wife, Jaime, also resides in the house, however, Mr. and Mrs. Pimlott currently maintain no relationship as husband and wife. Mrs. Pimlott remains in the home for financial reasons only.

(20) Father currently resides in the marital residence, residing alone when the subject minor children are not also present.

## II. DISCUSSION

The issue is primary physical custody. In making disposition, this court considered the testimony of the parties, an in camera conference with three of the minor children, Elisha, Abigail, and Montgomery or "Scotty", testimony from Mother's other children, James Cleland and Vana Goddard, Mother's paramour, Jason M. Pimlott,

a home assessment with an update of the marital residence conducted by Open Door International Inc., the custody questionnaires submitted by the parties at the court's direction, and the exhibits submitted.

Father presented first. He advised the court that he believes he is a good parent to the minor children. He is active with them in computer activities and playing board games. He is quite involved in the day-to-day maintenance of the minor children, as well as committed to working on the marital residence, which was bought several years ago and is a "fixer upper." If Father retains custody, the minor children's continuity and stability would be preserved, as they would continue to live in the marital residence, and have the same friendships.

In discussing Mother, Father wonders why she moved to Iowa. He believes she is being used as a housekeeper and a "nanny" for the Pimlott children. While he initially concedes that he was willing to move to Iowa with his wife and the Pimlotts, the other three adults were cool to the concept, as Father and Mrs. Pimlott did not "hit it off." The plan was to have Father residing in a separate residence somewhere nearby the Pimlott residence while Mother would reside with the Pimlotts.

Father questioned some of Mother's parenting skills. He believes she is too lenient with the minor children, that his method of discipline is much more appropriate. He questioned her commitment to the day-to-day caretaking responsibilities, including homemaking, food preparation, cleaning and the like. The care of the marital house was substandard. Father agrees that he shares in this responsibility, but also states that he had to work

at his employment, and do the renovation work at the house and did not have time for the day-to-day clean-up.

Mother provided a very different perspective. She states that the house was livable when she was there, as she did provide the necessary housekeeping. She also homeschooled the minor children, which took up a great deal of time. On the other hand, Father was inattentive to the needs of the minor children or the needs of the house, preferring to remain on his computer for long periods of time. Mother also had serious concerns about Father's driving ability, as he has been involved in several serious accidents.

Mother believes her new home is far superior. The minor children now reside in a clean house with adequate space for each child. They receive good meals, instead of fast food that Father cooks them when they are with him. The school districts are superior. Mother also has the ability to attend college based on the lower tuition rates in Iowa and the fact that she has access to an automobile.

Mother believes her relationship with Jason Pimlott is stable. Mr. Pimlott will obtain a divorce from his wife. In the meantime, his wife continues to reside at the Pimlott residence for financial reasons. She keeps to herself. Mother is solely involved in the housekeeping and in the care of the minor children, including the Pimlott children.

Mother is extremely concerned about the condition of the marital residence. The marital residence was never a showplace, requiring extensive work from the time the

parties moved in, even regarding such basics as building walls and installing appropriate plumbing and electric. The renovations never reached a satisfactory standard. Mother relates that even now there are exposed electrical wires, broken windows which are not being replaced, and remodeling that is incomplete. More importantly, since she has left, the housekeeping has become nonexistent. The residence is extremely cluttered, unsanitary, and dangerous. There is animal feces and animal smells everywhere. There are pet rats who have died and their carcasses remain in the cages. The kitchen and bedrooms are totally disheveled. The above-ground swimming pool has not been cleaned, resulting in stagnant green water.

In the home assessments conducted by Open Door, the investigator listed several areas of concern. These included, among other things, stacked cinder blocks being used as front steps to an entry to the home, a strong odor of urine, no bed linens for the minor children, exposed wiring on the second floor bathroom and basement, untested drinking water, outlets and light switches without switch plates, multiple broken windowpanes, some covered by boards, and no fence around the pool.

Mother believes that the minor children have adapted to their home in Iowa. While the minor children miss their Father, their clear preference is to remain in Iowa. They are now happy and content. The minor child, Scotty, has a disability which Mother perceives could be Asberger's syndrome. He is limited in his ability to be social. He has some difficulty in learning. He cannot tolerate music, particularly loud music. Mother notes

that Scotty's ability to function has improved since the move to Iowa. The school in Iowa appears well equipped to address Scotty's needs.

The fundamental issue in all custody cases is the best interest of the children. *Richards v. Hepfer,* 764 A.2d 623 (Pa. Super. 2000). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

In the case of *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990), the Pennsylvania Superior Court established the following factors for the trial court to consider on relocation matters:

"(1) The potential advantage of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent;

"(2) The integrity of the motive of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; and

"(3) The availability of realistic, substitute arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent." *Richards v. Hepfer, supra* at 626. (internal quotations and citations omitted)

We must observe a distinction from the *Gruber* analysis on the issue of burden of proof. Unlike *Gruber,* where

the relocating party sought to modify an existing custody order, in the within matter no order was entered prior to Mother's relocation. Accordingly, we are guided by the analysis of the Superior Court in *Collins v. Collins,* 897 A.2d 466, 472 (2006), where the court states:

"We emphasize that the *Gruber* factors, while important, are but one aspect of the overall best interest analysis that is required when the court is formulating a primary physical custody order as well as deciding a petition for relocation.

"[I]t seems to appear that if a trial court merely applies the specified *Gruber* factors to a case in which it has not yet awarded primary physical custody to one of the parents, that court has abused its discretion. This is because the *Gruber* factors take into account only those best interest concerns related to relocation: a small corner of the best interest cosmos. *Kirkendall v. Kirkendall,* 844 A.2d 1261, 1265 (Pa. Super. 2004).

"When, as in the case sub judice, there was no final custody order in place at the time that a parent filed a petition to relocate, then the trial court must scrutinize the custodial environment offered by each parent, without favoring one over the other, as part of the requisite best interest analysis. *Landis [v. Landis,* 869 A.2d 1003, 1012 (Pa. Super. 2005)]; *Kirkendall, supra* at 1265-66 (quoting *Marshall v. Marshall,* 814 A.2d 1226, 1230 (Pa. Super. 2002)); see also, *Thomas v. Thomas,* 739 A.2d 206, 211 (Pa. Super. 1999) (en banc). In the absence of a pre-existing custody order, both parents stand on equal footing, sharing the burden of production and persuasion. *Landis, supra* at 1012 (citing *Hurley v. Hurley,* 754 A.2d

1283, 1286 (Pa. Super. 2000)); *Burkholder v. Burkholder,* 790 A.2d 1053, 1058-59 (Pa. Super. 2002) (citing *Hurley, supra* at 1286-87). In other words, when the court fashions an initial custody order under circumstances where one parent wishes to relocate, the relocating parent does not have a greater burden of proof with regard to establishing the best interest of the child than does the parent who does not intend to move. *Hurley, supra* at 1286. The focus of the court must be on determining which parent and which living situation provides a familial setting that better serves the children's best interests. *Kirkendall, supra* at 1263-64; *Marshall, supra* at 1234." (footnotes omitted)

Initially, we note that the catalyst for the parties' separation consisted of grossly inappropriate conduct. Mother is now living with a man the parties met through the internet and who willingly engaged in group sex. Mr. Pimlott's wife continues to reside in the house which, at best, is difficult to explain and is likely a source of embarrassment for the minor children.

That being said, the blame for the marital breakdown and resulting circumstances must be borne equally by the parties. Father also willingly engaged in the alternate lifestyle. It appears that he would have moved to Iowa if he and Mrs. Pimlott would have formed a couple.

Secondly, we find that the living conditions in the marital home, where Father continues to reside, is abysmal. The reports by Open Door, the photographs, and the testimony all point to the fact that the house, in its current state, is not suitable to rear children, or to inhabit at all. If Father is to provide a suitable household,

he must immediately address the safety and sanitary concerns first, then, working within his budget, make appropriate renovations. He must come to realize that some "stop gap" measures must be taken in lieu of long-range planning, for he does not appear to have financial ability to meet the long-range goals he has set for the home.

Third, her moral and marital status issues notwithstanding, Mother appears to have the capacity to provide a good household for the minor children. She is motivated to keep a clean and safe household with the Pimlotts. She is a good caretaker for the minor children. She is very active in their education and social welfare. She appears to have been renewed by her odyssey, now taking pre-engineering classes, which could ultimately lead to her obtaining a degree, a well-paying career, and improvement of her self esteem.

The minor children appear to be doing very well in Iowa. Mr. Pimlott is a good provider, and from all indications, the household appears to run well, despite the fact that there are three adults and seven children under one roof.

We find that Mother's motives in moving to Iowa were not designed to keep the minor children from Father. In fact, initially, the parties left the decision on where the minor children would reside to the minor children. Additionally, as stated, the initial plan was for Father to also move to Iowa.

The quality of the minor children's life has substantially improved. The current custody arrangement, therefore, should remain intact.

It is important that Father continue to have extensive contact with the minor children. For that reason, the minor children should reside with Father during the summer months. However, for that to take place, Father will have to improve the quality of his residence sufficient to provide the minor children with a safe and sanitary home. As he has several months to accomplish this pending the minor children's arrival in the summer of 2009, there is no reason why this cannot be accomplished. This court shall require that Open Door inspect Father's residence one month prior to the minor children's arrival to assess whether the house is suitable for the minor children. If there is a concern, this court shall entertain a petition to determine whether Father's time with the minor children should be limited.

We enter the following order:

## ORDER

And now, August 14, 2008, after trial held, this court orders that custody of the parties' minor children, Elisha Cross, born December 13, 1992, Abigail Cross, born November 16, 1994, Montgomery Scott Cross, born October 7, 1996, Marissa Cross, born August 14, 1998, and Annika Cross, born September 8, 2000, (minor children), shall be as follows:

(1) The parties shall share legal custody of the minor children.

(2) Defendant, Debora Cross (Mother), shall have primary physical custody of the minor children during the school year. The school year shall be defined as one week prior to the start of school to one week following the end of the school year.

(3) Plaintiff, Scott Cross (Father), shall have custody of the minor children during the summer months. However, Father's custody time with the minor children is contingent upon him providing a safe and sanitary residence for the minor children. In that regard, Father shall submit his residence to an assessment to be conducted by Open Door International Inc., to be performed approximately one month prior to the minor children's scheduled arrival. Costs for the assessment shall be borne by Father. If there is a substantial concern raised by Open Door or through other evidence, Mother may file a petition with this court to determine whether this order shall be modified. Additionally, in subsequent years, if the condition of the home is determined to be substandard, this order may be modified on that basis.

(4) Father shall also have time with the minor children during the Christmas and spring breaks from school, the times to be arranged by the parties. Additionally, Father may visit with the minor children in Iowa, upon giving suitable notice to Mother of his intentions to travel there.

(5) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could

constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the children and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the children shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the children as he or she desires consistent with the proper medical care of the children.

(3) Neither party shall alienate nor permit to attempt to alienate the children from the other party. While in the presence of the children, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the children should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall, at all times, consider the children's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. How-

ever, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor children.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.