J-A06032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| T.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| G.R.C. | : | No. 1193 WDA 2025 |
| v. | : | |
| | : | |
| | : | |
| M.N.G. | : | |

Appeal from the Order Entered September 22, 2025
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD 18-002975-009

BEFORE: OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: March 13, 2026**

T.C. ("Maternal Grandmother") appeals pro se from the order entered by the Allegheny County Court of Common Pleas ("trial court") granting primary physical and sole legal custody of G.G. (a female born in December 2013) and B.G. (a male born in May 2017) (together, "Children") to their mother, G.R.C. ("Mother"), and permitting Mother to relocate with Children to Steubenville, Ohio.[1] Following our careful review of the record in this matter, we affirm.

_____

[1] The record reflects that M.N.G. ("Father") is incarcerated and did not participate in the proceedings below. As discussed below, however, his mother, E.G. ("Paternal Grandmother"), participated in the hearing and testified on behalf of Mother.

The trial court aptly summarized the procedural history underlying this matter:

Maternal Grandmother filed a complaint for custody on December 2, 2022[, alleging medical neglect of Children by Mother and physical abuse of B.G. and sexual abuse of G.G. by Mother's fiancé].[2]  After this, the [trial] court scheduled an interim relief hearing before a custody hearing officer.  Following the interim relief hearing, the trial court entered an order … dated May 26, 2023, that granted Mother primary physical custody of [] Children and partial physical custody to Maternal Grandmother every other weekend from Friday through Saturday.  Maternal Grandmother's custody claims were preserved, and the case was scheduled for a judicial custody conciliation on August 30, 2023.  Following the judicial conciliation, the court maintained the interim custody schedule on alternating weekends for Maternal Grandmother and reinforced the referral for the family to Dr. Frieda Reid through the Family Check Up Program at the University of Pittsburgh.  A second remote judicial conciliation was set for November 21, 2023, and a third remote judicial conciliation was set for December 28, 2023.

In January 2024, the [trial] court entered an updated interim custody [order] that expanded legal custody to shared legal custody between Mother and Maternal Grandmother but maintained the same shared physical custody schedule.  A fourth judicial conciliation was set for March 8, 2024.  Around June 2024, Mother relocated with [] Children from Pittsburgh, Pennsylvania to Steubenville, Ohio.  Maternal Grandmother presented an emergency petition for special relief.  The court originally directed Mother to return to Pittsburgh with [] Children in an order … dated June 24, 2024.  However, when Mother failed to comply with the emergency court order, the [trial] court entered a second interim custody order that granted Maternal Grandmother temporary

_____

[2]  The physical abuse allegations were based upon B.G.'s report to Maternal Grandmother and are discussed below.  The sexual abuse allegations were based upon Maternal Grandmother's observations of G.G.'s behaviors and her alleged complaints about pain in her rear end.  There is nothing in the record regarding these allegations other than testimony that Maternal Grandmother once saw G.G. sitting on his lap and his innocent explanation.

primary physical custody of [] Children and scheduled the matter for a one [] day custody trial.

A [pretrial] conference occurred on January 30, 2025, and the [trial] court scheduled a one [] day custody trial for May 7, 2025. On that date, the parties and [court appointed special advocate ("CASA")] appeared and participated in a judicial conciliation rather than a trial. Following this, the court entered an interim custody order dated June 20, 2025, that directed Mother and Maternal Grandmother to share physical custody during the summer with Mother exercising custody from Sunday to Thursday and Maternal Grandmother exercising custody from Thursday to Sunday each week. The parties appeared a second time for a one [] day custody trial on August 11, 2025. Maternal Grandmother and Mother both testified at the custody trial in addition to [L.H.] (Maternal Great-Grandmother), Michelle Bernard ([CASA]), … Paternal Grandmother[], O.F. (Mother's [fiancé])[,] and [S.C.] (Maternal Aunt).

Trial Court Memorandum and Final Order of Court, 9/15/2025, at 1-2 (hereinafter, "Trial Court Decision") (unnecessary capitalization omitted).

This is a particularly complicated custody and relocation matter based, in large part, on Children's medical fragility. Children are the third generation on Father's side of the family to be born with a rare form of congenital nephrotic syndrome, which, the record reflects

is characterized by loss of the body's protein through the urine, and its severity varies from person to person. Complications of this protein loss include body swelling, elevated cholesterol, anemia, certain vitamin deficiencies and increased risk for infection. This family's form of congenital nephrotic is also characterized by severe reactive airway disease. Many family members have sustained good renal function, but some have progressed to end-stage renal disease and transplantation. B.G. has had a more severe course than his sister and has a history of wheezing, consistent with other family members with this disease.

Exhibit 1 (CASA Report, 11/16/2023, at 1).[3]  Children require a low sodium diet and daily weight checks, as rapid weight gain is a sign of excessive fluid retention, which places them at risk of infection.

When this matter commenced and in the early days of the case, both Children had been hospitalized numerous times for complications related to their diagnoses.  Notably, B.G. was admitted to Children's Hospital of Pittsburgh ("CHP") for spontaneous bacterial peritonitis in November 2019 and July 2020, and again in April 2022 for sepsis caused by pneumonia.  *Id.* at 1-2.  Between December 2019 and September 2023, he was admitted more than two dozen times for accumulated abdominal fluid.  *Id.* at 2.  This has resulted in medication changes, including infusions, all with the goal of keeping him out of the hospital and living a normal, healthy life.  *Id.*

G.G. had not experienced the same level of complications as her brother, but she had a very serious medical emergency in December 2021 when she was hospitalized for spontaneous bacterial peritonitis.  *Id.* (CASA Report, 3/8/2024, at 2).  She reportedly nearly died, as she went into septic shock, requiring two rounds of intubation during her seventeen-day admission.  *Id.*

_____

[3]  Only the notes of testimony from the August 11, 2025 hearing appears in the certified record before this Court.  As the record reflects that the trial court found the CASA to be credible and the parties agreed to the admission of all the CASA reports as exhibit 1, we utilize these reports to detail the factual history underlying this matter.  *See* N.T., 8/11/2025, at 202-03; Trial Court Decision at 10.

- 4 -

There have been concerns up until the final few months leading up to the hearing about Mother's failure to recognize when hospitalization was needed, stay at the hospital when Children were admitted for lengthier periods of time, and abide by Children's dietary restrictions. For example, in March 2025, B.G. required a two-week hospitalization because of spontaneous bacterial peritonitis. This episode occurred on the heels of Children spending the weekend of February 21, 2025 in Mother's care. She did not return them to Maternal Grandmother on February 23 as ordered, instead keeping them for the entire week, which required them to go without their medicine for an extended amount of time. *Id.* (CASA Report, 5/7/2025, at 3).

As the case progressed, however, Mother slowly began taking a more active role in ensuring Children received the low-sodium diet they needed, working with CASA to learn new recipes and keeping a food journal as requested by both CASA and Children's medical providers.[4] Mother explained her prior inability to spend overnights at the hospital was because she has two younger children who require care and her fiancé (their father) leaves for work before 5:00 a.m. with no alternative care available for another hour or two. *See* N.T., 8/11/2025, at 157.

_____

[4] During the pendency of this case, CASA assigned Michelle Bernard, MS, RD, LDN, as Children's advocate. Ms. Bernard "is a renal dietitian and nutrition manager with 26 years' experience managing patients with all stages of End Stage Kidney Disease. She also trains/mentors other new renal professionals." Exhibit 1 (CASA Report, 5/7/2025, at 1).

Children also had serious educational concerns, including excessive absenteeism, unaddressed learning differences, and failing to complete assignments. *See* Exhibit 1 (CASA Report, 11/16/2023, at 2-6). Mother had reportedly been referred to the magisterial district judge based upon the number of unexcused absences for Children. She historically had little communication with Children's school and was difficult to reach. For example, although Mother contacted the school about having G.G. tested to see if she qualified for special education services when she was in third grade, Mother initially failed to respond to the school's multiple attempts to reach her thereafter or to return the paperwork to begin testing. She eventually did respond, and G.G. was evaluated and found to qualify for special education services just prior to Mother moving Children midyear from a brick-and-mortar school to a cyber charter school. The charter school implemented G.G.'s individualized education plan ("IEP"), but Children's inconsistent attendance and missing assignments continued. Mother moved them to a brick-and-mortar charter school during the same school year a couple of months later, where unexcused absences and difficulty contacting Mother continued to be a problem.

There was also a concern about Mother's fiancé physically disciplining B.G. In particular, he struck B.G. with a drumstick that B.G. was fighting over

with his younger half-sister, leaving a bruise on B.G.'s leg.[5] N.T., 8/11/2025, at 32. Child protective services reportedly conducted an investigation and closed the matter with no involvement or findings of abuse. Both Mother and her fiancé testified that they have ceased using any form of physical discipline in their home. *Id.* at 168, 267.

Maternal Grandmother has been a stalwart support throughout Children's lives. She would visit Children in the hospital, stayed with them if they had to remain there overnight, and was, at times, the one who took them to the emergency room in the first place. She also communicated regularly with their schools. During the early reports, CASA expressed concern about Mother's willingness and ability to address Children's medical and educational needs, recommending increased time with her, including awarding her primary physical and shared legal custody of Children. *See, e.g.,* Exhibit 1 (CASA Report, 3/8/2024, at 6; CASA Report, 8/5/2024, at 5; CASA Report, 5/7/2025, at 8).

When Children were placed in Maternal Grandmother's primary care, she enrolled them in her neighborhood public school for their fourth- and second-grade academic years. She was highly involved in ensuring their educational and dietary needs were met. She also enrolled them in counseling through the school. Children's school attendance, however, remained

---

[5] Mother's fiancé confirmed this story was true. N.T., 8/11/2025, at 268.

problematic in Maternal Grandmother's care. Children each had several unexcused absences (6 for G.G. and 2 for B.G.), they were late to school almost daily, with 105 and 97 unexcused tardies, respectively, and numerous excused absences (27 for G.G. and 57 for B.G.). *Id.* (CASA Report, 8/11/2025, at 3). She enrolled them in the school's summer enrichment program, where Children attended fifteen of sixteen sessions, but were late eleven of those days.

Maternal Grandmother also began to have "intense disagreements" with members of Children's medical team. *Id.* at 5. Children had been followed by Dr. Michael Moritz and Dr. Jacqueline Ho through CHP's nephrology department. Dr. Moritz left CHP to work at Akron Children's Hospital, but Dr. Ho remained as Children's primary provider. Without consultation with the medical team at CHP or Mother, Maternal Grandmother took Children for a second opinion from Dr. John McAteer in the nephrology department at Children's Hospital of Philadelphia ("CHOP"). It was Maternal Grandmother's intention to make Dr. McAteer the primary provider for both Children, notwithstanding that CHOP was more than 300 miles away. She only confirmed this after Dr. Ho became aware from another source that B.G. had been seen by CHOP and received treatment there. Dr. Ho expressed that Children must be limited to a single care team for their safety, there was a risk B.G. was receiving more diuresis than needed (which Maternal Grandmother stated she did not understand), and that team could be through

any provider agreed to by both Maternal Grandmother and Mother. *Id.* at 6. Maternal Grandmother also did not provide any food logs or diet information to CASA or CHP, as requested. *See* N.T., 8/11/2025, at 76 (Maternal Grandmother testifying on cross-examination that she did not "believe [she] needed to do that [b]ecause I'm not the one that is not caring for your children.").

In July 2025, Maternal Grandmother brought B.G. to CHP for diuresis treatments almost weekly. This was shortly after she took him to CHOP for a diuresis treatment at the end of May (which had been preceded by two additional diuresis treatments at CHP in May). On several occasions, CHP concluded that B.G. was ready to be discharged, but Maternal Grandmother disagreed and refused to take him home, requiring him to be released to Mother's care. After one such discharge to Mother's care, Maternal Grandmother returned to the CHP emergency room with B.G. the following day (on July 31, 2025); the child was determined to be well and released without treatment.[6] Exhibit 1 (CASA Report, 8/11/2025, at 8); *see also* N.T., 8/11/2025, at 107-08 (Mother testifying that CHP has been calling her more because Maternal Grandmother refuses to take B.G. home after treatments).

_____

[6] That same day, a Childline report was made "alleging concerns of maltreatment by overmedicalization by [Maternal Grandmother]. An investigation has begun[.]" Exhibit 1 (CASA Report, 8/11/2025, at 8. At the time of the hearing, no new information regarding the investigation was available.

Indeed, the nephrology department observed that as of the end of July 2025, B.G. had "been admitted monthly over the past year, although several of [these] admissions have been primarily for observation, related to concerns of his [Maternal G]randmother regarding fluid retention[.]" Exhibit 1 (CASA Report, 8/11/2025, at 9) (quoting Nephrology Report, 7/27/2025). The record reflects that Maternal Grandmother has a deep distrust for Children's medical team. *See, e.g.,* N.T., 8/11/2025, at 88 (Maternal Grandmother referring to Dr. Ho as being in "cahoots" with Mother).

CHP held a care conference on July 10, 2025, at which Mother, Maternal Grandmother, Dr. Ho, an insurance case manager, CASA, and Dr. McAteer (for the first twenty minutes, virtually) attended. The goals established by Dr. Ho were to have Children thrive in daily living, stay out of the hospital, and grow, and to determine Children's primary nephrology provider. It was here that the record provides some insight into Maternal Grandmother's disagreements with CHP's treatment of Children, especially B.G. As summarized by CASA:

> Dr. Ho highlighted [B.G.'s] most recent hospitalization [at that time] from July 1, 2025-July 3, 2025[, initiated by Maternal Grandmother,] where he was admitted at 55.6 lbs. for an infusion and left around 53.7 lbs. She spoke of her observation of him playing before he received any infusions at 55 lbs. and he was running, jumping, skipping down the hall, laughing, eating, drinking and very full of life. She said that visually his abdomen was distended; however, it was also soft and compressible and he did not have any shortness of breath. She stated that a distended abdomen is a hallmark symptom of his diagnosis of congenital nephrotic syndrome, and the goal is not to treat him to the weight and point where that is completely gone. She discussed the risk factors that are associated with excessive diuresis and taking his weight too low, namely blood clots and strokes.

Exhibit 1 (CASA Report, 8/11/2025, at 7); *see also* N.T., 8/11/2025, at 189 (CASA testifying that "the diagnosis of the congenital nephrotic syndrome basically is going to have fluid retention, and it's going to have a distended abdomen. So it comes down to if it's hard, if he's short of breath, if he has symptoms of fluid overload or if he doesn't."). Dr. McAteer stated that he agreed with the course of treatment CHP was providing B.G. and made one additional suggestion to determine whether the child's body responded appropriately to vaccinations he received as a baby and toddler, potentially taking additional steps to protect B.G. from the bacteria that caused three of his five hospitalizations for peritonitis. Maternal Grandmother was reportedly silent throughout the care conference and asked no questions.

The record shows the relationship between Mother and Grandmother has become more and more acrimonious as the case progressed. For example, although Mother and Maternal Grandmother were awarded shared legal custody of Children in the June 2025 interim custody order and both were to be involved in Children's medical decisions, Maternal Grandmother did not inform Mother about the second opinion she sought through CHOP, refused her access to the CHOP patient portal, and changed the login information for Children's medical insurance. Exhibit 1 (CASA Report, 8/11/2025, at 5).

Children very much feel stuck in the middle of two people they love dearly. Each has expressed a preference to all parties—Mother, Maternal Grandmother, CASA—as well as to their therapist, to live with Mother, but

B.G. especially feels a sense of disloyalty to his Maternal Grandmother as a result.

Both Mother and Maternal Grandmother proceeded pro se at the hearing, at which the trial court patiently and respectfully allowed each to testify, call witnesses, cross-examine each other and the other's witnesses, and enter exhibits into the record. CASA also entered reports detailing her independent investigations into the concerns about Children and made recommendations to the trial court regarding the custody dispute.

As noted in the trial court's decision, Mother relocated to Ohio during the pendency of the custody matter without informing or seeking permission from the trial court. According to Mother, she was unaware that she needed to obtain permission prior to moving. She stated, however, that she has arranged for Children's medical care at Akron Children's Hospital where, as previously stated, Children's prior primary nephrologist currently works. She also has vowed to make arrangements to stay with Children in the event they require additional hospitalizations—including asking for help from Father's family to care for her other children and utilizing a Ronald McDonald House located near the hospital—as Akron Children's Hospital is approximately an hour away from her home in Steubenville.[7]

---

[7] Mother's fiancé further testified that there is an adult hospital very near to their home and in "a medical emergency," they would take Children there to be transported to Akron Children's Hospital. N.T., 8/11/2025, at 266.

- 12 -

Further, Mother testified that she has taken a more proactive approach to Children's education. She visited the school B.G. will attend if returned to her care during the 2025-2026 school year to ensure it can meet his educational and medical needs. She has also identified the school G.G. will attend and plans to visit there prior to the start of the school year.

In her testimony, Mother recognized the importance of ensuring Children's medical and educational needs are met, but she also expressed concern about their "[e]motional development." N.T., 8/11/2025, at 113. To address this, she wants to enroll them in activities, such as baseball (which B.G. has played before and enjoyed), and gymnastics, flag football, and wrestling (all of which G.G. has expressed an interest), and not let their diagnoses define them and their lives. *Id.* at 113-14; *see also id.* at 108 (Mother testifying that with Maternal Grandmother, Children do not play outside or have any social outings).

Paternal Grandmother provided testimony in support of Mother. She stated that she has been living for nearly sixty years with the same diagnosis with which Children are afflicted, and numerous family members, including four of her children, four of her grandchildren, and her niece, great-niece, and nephew, are also living with this illness. And although her fourteen-year-old niece has a distended stomach ninety percent of the time, "[s]he plays sports and she cheerleads," stressing that Children "can carry on like a normal child. So it's livable." *Id.* at 209. Paternal Grandmother acknowledged the

difficulties associated with the condition, noting that the same niece she spoke of "was in a coma for a couple of months" as "[s]he was septic[, … b]ecause the fluid on the belly can get infected." *Id.* at 212.

For her part, Maternal Grandmother expressed continued concern about Mother's failure to address Children's medical needs. In her view, Mother "has neglected her children's medical and educational needs and continued to do so with the help of her [fiancé] and the kids' neglectful nephrology care team." *Id.* at 46. According to Maternal Grandmother, she is the only one who has fought for Children's medical and educational needs, as well as their safety and security, and she has "earned the right to continue caring for them until their mother gets her mind right." *Id.* at 43, 55. Maternal Great-Grandmother echoed much of Maternal Grandmother's testimony, confirming that Maternal Grandmother, and not Mother, has addressed Children's needs.

CASA made its recommendation at the hearing that Children be returned to Mother's primary custody and that she be granted full legal custody:

> I'm concerned that [Maternal Grandmother] is driven in ways around overmanaging his medical status, and she's not seeing the holistic medical picture of him and the detriment that that could cause to him as he grows up with just how he views himself and his own medical management and his diagnosis.
>
> [Mother], I feel like, has a better, more grounded perspective of the kids holistically as growing children, and she wants to not allow that diagnosis to define them. She wants to teach them not to allow that diagnosis to define them.

*Id.* at 192. Further, in CASA's view, Mother has "been open to feedback for better care and better management of their medical needs," and "shown more

- 14 -

openness and desire to have feedback" as to Children's dietary and educational needs. *Id.* at 192, 194. CASA stressed in the report that the "recommendation is not reservation," as Mother's 'increased involvement is relatively recent and we do not downplay or discount the shortcomings of her not meeting the medical and educational needs of [Children] in the past." Exhibit 1 (CASA Report, 8/11/2025, at 10). "Despite these reservations, it is each [party's] approach to [C]hildren's current medical needs and the current ChildLine investigation that is the determining factor in our recommendation." *Id.*

The trial court took the matter under advisement, issuing its written decision on September 15, 2025. After considering the separately enumerated relocation and custody factors of sections 5337 and 5328 of the Child Custody Act, it determined "the relocation factors were either neutral or favored [] Children relocating to Steubenville, Ohio; and [] the custody factors favored Mother as the primary physical and sole legal custodian with partial physical custody to Maternal Grandmother in a manner that provided [] Children with an ongoing and consistent relationship with her." Trial Court Opinion, 11/12/2025, at 5-6 (pagination supplied).

Maternal Grandmother filed a timely notice of appeal along with her concise statement of errors complained of on appeal as required by Rule 1925(a)(2)(i) of our Rules of Appellate Procedure. Therein, as interpreted by the trial court, she challenges the sufficiency of the evidence to support a

finding that it was in Children's best interests to grant Mother's request to relocate with Children to Ohio and return Children to Mother's primary physical and full legal custody. *See* Notice of Appeal at 1; Trial Court Opinion, 11/12/2025, at 1-2.

At the outset, we note that Maternal Grandmother's brief fails to conform to our Rules of Appellate Procedure in nearly every respect.[8] Most significantly, the entirety of her statement of the facts is based upon events that occurred after the hearing in this matter, *see* Maternal Grandmother's Brief at 1-4, and her legal argument does not include citations or any statute, rule or case law, *see id.* at 4. Instead, she badly states the trial court erred by accepting Mother's testimony and failing to give credence to her own, which she contends supports reversing the trial court's decision. *Id.* Maternal Grandmother further contends that a "material change in circumstances" has occurred since the issuance of the trial court's order, as Mother continues (as before) to "refuse[] to provide appropriate care for her child(ren) to prevent multiple hospital admissions and when the child(ren) need medical care she refuses to take them, she has also refused the children to be transferred to a better care team," requiring Children "to suffer until Maternal Grandmother has her visitations." *Id.* at 4, ¶ 1 (unnecessary capitalization omitted).

---

[8] Neither Mother nor Father filed a brief on appeal. At oral argument in this matter, Mother appeared and informed the panel that she did not file a brief because she did not receive Maternal Grandmother's brief.

Although we could find waiver for any of the above reasons, we decline to do so because of the very serious nature of the matter at hand. We note, however, to the extent Maternal Grandmother seeks for us to consider matters that have occurred after the custody hearing that is at issue in this appeal, "it is black letter law in this jurisdiction that an appellate court cannot consider anything which is not a part of the record in the case." *Smith v. Smith*, 637 A.2d 622, 623 (Pa. Super. 1993) (citation omitted).[9]

Further, this Court cannot reverse the trial court on issues of witness credibility and the weight assigned to the evidence presented; those are "exclusively for the trial court as fact-finder in custody matters, … as the trial court had the opportunity to view and assess the witnesses first-hand." *A.L.B. v. M.D.L.*, 239 A.3d 142, 149 (Pa. Super. 2020) (citation omitted). Instead, our review of custody decisions is limited to determining whether the trial court abused its discretion. *Graves v. Graves*, 265 A.3d 688, 693 (Pa. Super. 2021) (citation omitted).

> We are not authorized to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported by the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

---

[9] As to Maternal Grandmother's claim of a "material change in circumstances," we remind her that a petition for modification of custody may be filed before the trial court to bring any new information to that court's attention in the first instance. *See* 23 Pa.C.S. § 5328.

*Marshall v. Marshall*, 814 A.2d 1226, 1229 (Pa. Super. 2002) (cleaned up).

We further observe:

> It is axiomatic that in custody disputes, the fundamental issue is the best interest of the child. In a custody contest between two biological parents, the burden of proof is shared equally by the contestants. Yet, where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a prima facie right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

*Charles v. Stehlik*, 744 A.2d 1255, 1258 (Pa. 2000) (cleaned up).

The trial court fully reviewed each of the custody and relocation factors and found, based upon its credibility determinations, that it was in Children's best interests to move to Ohio with Mother and for her to have full legal and primary physical custody subject to Maternal Grandmother's periods of partial physical custody. Beginning with its consideration of the custody factors,[10]

_____

[10] Pursuant to the version of section 5328 in effect at the time of the custody hearing in this matter, when ordering any form of custody, a trial court must determine the child's best interest by considering each of the factors below, with weighted consideration to be given to factors (1), (2), (2.1), and (2.2), which impact the child's safety:

> (1) Which party is more likely to ensure the safety of the child.

> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

*(Footnote Continued Next Page)*

_____

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

*(Footnote Continued Next Page)*

the trial court largely found the factors were either neutral, inapplicable, or favored both Mother and Maternal Grandmother equally. ***See generally*** Trial Court Decision at 3-13. Most significant for our purposes, the trial court conducted a lengthy review of factor 10—the party more likely to attend to Children's daily physical, emotional, educational, developmental, and special needs—and concluded that it favored Mother:

> Both Mother and Maternal Grandmother acknowledge [] Children are diagnosed with congenital nephrotic syndrome as well as reactive airway disease. This is a serious condition, and [] Children require regular and routine medical care as well as frequent emergency medical treatment. While Mother and Maternal Grandmother have always conflicted with each other, they initially were able to coordinate medical care for [] Children and at least work in a parallel relationship to make sure that [] Children received the care that they required. At some point in the last two years, this changed when Mother started to show less of an ability to provide good care and good judgement when parenting [] Children and meeting their medical needs. Maternal Grandmother took on a more primary decision making and care provider role. Despite this, Maternal Grandmother continued to involve Mother, or at a minimum, update Mother with information

---

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

*Id.* § 5328(a) (effective Aug. 13, 2024-Aug. 28, 2025).

about [] Children's medical conditions and treatment, even if she criticized Mother at the same time. Additionally, Maternal Grandmother continued to follow the recommendations of [] Children's medical treatment providers. The same is true about [] Children's educational and developmental needs, with Maternal Grandmother ensuring that [] Children were enrolled and attended school and therapy when Mother did not. If fact, the primary reason that the [trial c]ourt temporarily placed [] Children[] in Maternal Grandmother's custody was directly related to Mother's decisions to remove [] Children from their routine and regular educational and medical providers. Michelle Bernard, the [CASA,] has credibly documented these behaviors and decisions in their prior reports dated November 16, 2023, March 8, 2024, March 17, 2025, May 5, 2025, and August 11, 2025, where she relied on detailed information that she gathered from [] Children's doctors, teachers, specialists, family members, etc.

Recently, this has changed again. The credible testimony and evidence presented at trial confirmed that Maternal Grandmother is more driven by overmanaging [] Children's medical status while Mother has a holistic approach to the Children's diagnosis and does not want it to consume their entire existence. Additionally, Maternal Grandmother has questioned or doubted [] Children's current and regular medical providers, researched her own medical treatments, blocked and/or eliminated Mother from access to information and obtained secondary or duplicate treatment without Mother's consent or knowledge by [] Children's current doctors. More specifically, Mother was removed from [] Children's Highmark medical insurance login while in Maternal Grandmother's custody and Mother could not see [] Children's care plans unless it was directly through [CHP]. Additionally, Maternal Grandmother sought treatment for [] Children at [CHOP] and attempted to transfer [] Children's medical care to this hospital without telling Mother or [] Children's doctors in Pittsburgh. Maternal Grandmother has become suspicious of [] Children's medical providers, testifying at trial that they withheld information and that they were not transparent. Maternal Grandmother believes that they are not getting the highest level of treatment with their current doctors and no longer aligns fully with the treatment plan here in Pittsburgh. Finally, Maternal Grandmother is hyper focused on [] Children's weight and fluid retention, which while a significant part of treating their medical condition, is not the only indicator of their level of health.

In contrast to this, Mother testified that she wants a life for [] Children where they are defined as more than just their illness. This is different than Maternal Grandmother, who through her testimony, appears to be focusing primarily on providing [] Children with lives that only stress the importance of protecting them from risks of their diagnosis. Mother called upon [] Paternal Grandmother who credibly testified about living with the same diagnosis as the Children for the last sixty [] years. Paternal Grandmother recognized that while serious, there was no one way to "deal" with it and that fluid retention, infections and swelling were all part of a life with this diagnosis. Paternal Grandmother testified that not only is she living with the disease, but her four children, four grandchildren and teenage niece all live with the same diagnosis. All these family members have productive lives. Mother wants the same for [] Children. Mother wants [] Children to be involved in activities and sports that match their interests. Mother wants [] Children to feel "normal" and give them the freedom to explore their futures without being held back by their medical conditions.

As stated above, the positive impact of Mother's actions on [] Children's lives is reinforced by the current and credible recommendations of the [] CASA. Unlike the prior CASA reports that listed very specific concerns about Mother, in the August 11, 2025 report, CASA indicated that Mother has made increased efforts to be more appropriately responsive to Children's medical and educational needs. She has visited with their potential school and sought out resources, the [sic] has been more open to working with medical professionals and tracking information that assists with [] Children's medical care. She has been proactive with communicating with [] Children's teachers and medical team. Mother has taken steps to ensure that the Children can move closer to having a life that is not defined by their medical condition, even when meeting the needs of their medical treatment.

*Id.* at 9-11.

As our recitation of the facts underlying this matter hereinabove reflects, the trial court's findings are fully supported by the record. Moreover, the trial court's determination here is based upon its credibility determinations and the

weight it decided to accord to the evidence presented. As such, we have no basis to reverse the trial court's custody decision.

The same is true for its relocation decision. The trial court fully considered each of the relocation factors, as required by section 5337(h).[11]

_____

[11] In determining whether to allow a request for relocation, the trial court must consider the following, with weighted consideration to be given to any factor affecting the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

*(Footnote Continued Next Page)*

*See id.* at 13-16.  Based on the evidence of record, for which the court made credibility determinations and ascribed the weight to be accorded thereto, it found that Mother's relocation of Children to Ohio was in their best interests, finding nearly all factors favored relocation (two the court found to be neutral as inapplicable).  *Id.*  Again, we have no basis to disturb the trial court's determination.

As the trial court correctly and succinctly put it at the end of its decision:

> The success of this family relies on two things.  First, Mother must continue down this new path of ranking [] Children's medical, educational, emotional, and social needs first (even when it is most difficult in Mother's own life)[.  Second,] Maternal Grandmother needs to recognize and support Mother's efforts when she is doing a good job at parenting (even if different th[a]n how Maternal Grandmother would do it).

*Id.* at 17.

Order affirmed.

Judge Murray joins the Memorandum.

Judge Olson concurs in the result.

---

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/13/2026